HENDRICKS *against* ROBINSON, FRANKLIN and others.

This Court lends its aid to a judgment creditor, by compelling a discovery and account, against a debtor or third person, who has possession of the debtor's property, and placed beyond the reach of the legal process ; but the creditor, before he is entitled to such aid, must have sued out execution at law.

One creditor may file a bill in behalf of himself and all the other creditors ; and where one judgment creditor filed a bill for himself alone, it was sustained, it not appearing that there were any other creditors ; or if there were, there was reason to believe their judgments had been satisfied ; or if not satisfied, they had not taken any steps at law to enforce payment by execution ; and, at any rate, all parties concerned in such judgments were brought before the Court.

Conveyances by a debtor, of his real estate, declared fraudulent and void against his creditors, under the circumstances.

Assignments of personal property by a debtor, in insolvent circumstances, and who has stopped payment, to secure a particular creditor for existing claims and engagements, as well as for future advances and responsibilities, if made *bona fide*, and where there is no reason to doubt the honesty and fairness of the transaction, will be deemed valid.

A creditor, to whom his debtor has assigned property, as security for advances and responsibilities, with an agreement that if the property is not redeemed within a certain time, the assignee may sell it, to pay and indemnify himself, may, after the expiration of the time limited, sell the property for his indemnity ; and may, with the assent of his debtor, become the purchaser thereof, and of the equitable or residuary interest of the debtor, at a fair and adequate valuation ; and such purchase made *bona fide*, and without intent to injure or defraud creditors, will be valid, not only against the debtor, or *cestui que trust*, but against all other persons.

The mere equitable interest of a debtor, in personal property assigned by him as security, cannot be reached by process at law, or be bound by execution.

Suing out execution merely does not create a *lien* on goods and chattels; but there must be an actual levy of the execution to bar the subsequent *bona fide* sale.  The property of the debtor, in goods and chattels, is not changed, until the execution is executed.

Where *F.*, a debtor, in embarrassed circumstances, made an assignment (absolute on its face) of personal property to *W.*, a creditor, as security for a new loan of money, and for existing claims, and also for his indemnity against existing and future engagements, especially all such as should arise in the management of the property assigned ; *W.*, for the purposes of the assignment, effected a loan of money from *P.*, on condition of guarantying to him a debt due to him from *F.*, to be paid out of the proceeds of the property so assigned ; it was held that *P.*, by lending his money to *W.* on this guaranty, acquired an equitable *lien* on, and was entitled to be paid his debt out of, the proceeds of the property in the hands of *W.*, in preference to other creditors.

The assignee, under such an assignment, is entitled to his *commissions* on the sale of the property, according to the stipulation contained in the assignment, unless the allowance is so disproportionate and extravagant as to afford evidence of fraud.

[ * 284 ]

THE bill was filed, on the 3d of *June,* 1809, by the plaintiff, (a judgment creditor of *Robinson & Franklins,*) against *William T. Robinson, Abraham Franklin, John Franklin, Henry Franklin, Matthew Franklin, Benjamin G. Minturn, John T. Champlin, Jacob Walden,* and *Thomas Walden,* and several others, as mortgagees, made parties, *pro forma.*

Prior to the year 1807, *Samuel Franklin,* (who died on the 4th of *September,* 1807,) *William T. Robinson,* and *Abraham Franklin,* were partners in trade, under the firm of *Franklin, Robinson & Co. John Franklin* was also concerned in trade.

*Samuel Franklin* was seised of a large real and personal estate, at the time of his decease, all which he devised to *William T. Robinson, Abraham Franklin,* and *John Franklin;* and, after the death of *S. F.,* they were jointly interested and concerned in all the commercial dealing, and business \*transacted under the firm of *Franklin, Robinson & Co.* or in the name of *John Franklin.*

[ \* 285 ]

In *December,* 1807, being much embarrassed, they borrowed of the banks 200,000 dollars, as a security for which they mortgaged real estate, to the value of 550,000 dollars, as stated in the bills and also gave the personal responsibility of several merchants, to the amount of the loan, among whom were the defendants, *Minturn & Champlin, Henry Franklin, Thomas Franklin,* and *J. & T. Walden.* These responsibilities were contingent, being only for any eventual deficiency in the mortgage security.

On the 30th of *December,* 1807, *Franklin, Robinson & Co.,* and *John Franklin,* stopped payment, and in *January,* 1808, the plaintiff commenced suits against them, as drawer and endorsers of bills of exchange, returned protested for no payment, and recovered judgments to the amount of 26,647 dollars and 48 cents.

The bill charged, that *W. T. Robinson, A. Franklin,* and *J. Franklin,* since they stopped payment, had fraudulently conveyed away their real and personal estate, in trust, without any valuable consideration, and with a view to defraud and defeat their creditors; and the conveyances and assignments alleged to be fraudulent were particularly specified by the plaintiff, who, stated, also, that on the 6th of *February,* 1809, he issued execution on his judgments, obtained as above mentioned; but, by reason of the fraudulent transfers so made by *W. T. R., A. F.,* and *J. F.,* he could obtain no satisfaction of his judgments, &c.

The bill prayed, that all the real and personal estate conveyed by *W. T. R., Abraham F.,* and *John F.,* or either of them, since they stopped payment, to *Henry F. Minturn* and

1817.

HENDRICKS
v.
ROBINSON.

[ * 286 ]

*Champlin*, and *J. & T. Walden*, or either of them, might be decreed to be applied to the payment of the plaintiff, free from all encumbrances, imposed since the same was so conveyed; and that all such grants, conveyances and assignments might be decreed to be cancelled; *or that the plaintiff might be allowed to redeem the lands mortgaged to the banks, &c.; or that the same might be sold under a decree of the Court, and that after the mortgage debts were paid out of the proceeds, the residue might be applied to the payment of the plaintiff's debt.

After answers had been put in to the bill, the defendants, *William T. Robinson, Abraham Franklin, John Franklin,* and *Henry Franklin,* severally applied for and obtained their discharges under the insolvent act of this state, in 1811; and the plaintiff, accordingly, filed a *supplemental* bill, in *January,* 1813, against the defendants to the original bill, and the assignees of the defendants who had been discharged as insolvents. The supplemental bill stated, that *Abraham F.,* in his account to the judge, before whom the proceedings were had, relative to his discharge under the insolvent act, omitted to state a judgment of *John Mowatt,* of the 6th of *May,* 1798, for 18,174 dollars and 56 cents; a judgment of *J. & N. Heard,* for 22,775 dollars and 38 cents, and a judgment of *W. G. Miller* and others, of the 8th of *May,* 1808, for 6,165 dollars and 9 cents, against *Robinson, Abraham F.* and *John F.;* and that *Abraham F.,* on his examination before the judge, declared that these judgments were satisfied by *Henry F.* with property delivered to him by *Abraham F.* and *John F.,* and which had not been noticed in their account with *Henry F.* That *Henry F.,* who obtained his discharge on the 30th of *December,* 1811, in the inventory of his estate exhibited to the judge, represented those three judgments as his property; and on his examination, stated, that *Abraham F.* and *John F.,* in *January,* 1808, delivered to him, *Henry F.,* several promissory notes drawn by *Thomas F.,* amounting to 40,000 dollars. That *Thomas F.* having possessed himself of the judgments above mentioned, the judgments and notes, by an agreement between *H. F., T. F., A. F.,* and *J. F.,* and *John Townsend,* were included in a settlement of accounts between *Franklin, Robinson & Co., John Franklin,* and *John Townsend,* and a balance stated against *J. Townsend,* which *Thomas F.* assumed to pay to *Henry F.,* and by him passed to the credit of *A. F.* and *J. F.;* and that those notes were delivered to him, *H. F.,* by *A. F.* and *J. F.,* and were not passed to their credit, or noticed in the books of *H. F.,* but were delivered by him to *Thomas F.,* who, in consideration thereof, assigned to him the judgments, and

[ * 287 ]

226

which he, *H. F.*, considering them as in full force, had included in the assignment to his assignees; and the plaintiff charged this to be fraudulent as against him, &c.

The defendants, *Henry F.* and *Matthew F.*, in their answer, put in the 23d of *October*, 1809, stated, among other things, that *H. F.* was security for *Franklin & Robinson*, and *John F.*, to the banks, for 20,000 dollars; that when *Robinson & Franklin* stopped payment, *Henry F.* and *Matthew F.* were contingently responsible for them, to the amount of 120,000 dollars, and, being alarmed, applied to them for security; and, afterwards, in *January*, 1808, *A. F.* and *J. F.* offered their real estate as security, which was refused, under an expectation of obtaining personal security, of a more disposable nature. That it was agreed that *M. F.* should withdraw, and that *H. F.* should have the whole management of their mutual and copartnership concerns; that *William T. Robinson* having withdrawn from the concerns of *Robinson & Franklin*, *Henry F.* entered into an agreement with *Abraham F.* and *John F.*, for the purchase of all their real estate, including what was mortgaged to the banks, and what *W. T. R.* had released to them. That the lands were fairly valued at what they were deemed to be worth, which valuation was set forth in a schedule of the estate conveyed, annexed to the answer. That the consideration for the conveyance consisted of the claim of *Henry F.*, his notes and his engagements to pay certain confidential creditors of *Robinson & Franklin.* The deeds for the real estate were set forth in the answer, and the valuation, free from encumbrances, *was 721,663 dollars; the mortgages specified, amounted to 289,674 dollars and 51 cents, of which amount 219,000 dollars was deducted, leaving 502,663 dollars as the consideration, and which included the sum of 70,764 dollars of the mortgages which *H. F.* assumed to pay off; the residue, being 431,805 dollars and 79 cents, was paid, in certain advances, responsibilities, and notes of *Henry F.*, which were specified in a schedule annexed to the answer, and which were also specified in the answer of *Robinson*, and *A. F.* and *J. F.* That *Henry F.* afterwards purchased of *Abraham F.* and *John F.* the residue or balance, whatever it might be, in the hands of *Minturn & Champlin*, to whom they had assigned certain vessels and cargoes, and received an order on *M. & C.* for that purpose, dated *April* 3d, 1808, and which was accepted by *M. & C.*; that this was a *bona fide* purchase on speculation, for which he, *H. F.*, gave to *A. F.* and *J. F.* his three several promissory notes for 15,000 dollars each; but this purchase was, afterwards, in *May* or *June*, 1809, rescinded by consent, and the notes given up. That on the 3d of *April*, 1808, he, *H. F.*, also purchased

[ * 288 ]

of *A. F.* and *J. F.* the balance to be coming to them from the proceeds of certain vessels and cargoes assigned by them to *J. & T. Walden,* and received an order on *J. & T. Walden* for that purpose, which they accepted on the 5th of *May,* 1808; that the consideration of this purchase, which was made on speculation, *bona fide,* was 21,000 dollars, for which he gave his three several notes to *A. F.* and *J. F.,* payable in one, two, and three years; that on the 27th of *April,* 1808, he, *H. F.,* received of *J. F.* four notes of *M. & C.,* at six months, which were regularly paid, the principal and interest of which amounted to 7,532 dollars. That he also received, in *February,* 1808, of *J. & E. Ferris,* on a transaction which was specified, 8,000 dollars, for which he was ready to account to *A. F.* and *J. F.;* and that in *June,* 1808, he received for them, of *N. Hawkshurst,* 851 dollars and 67 *cents, for which he held himself accountable. That since *Robinson & Franklin* stopped payment, he, *H. F.,* had made advances for them, and given his notes, to the amount of 33,640 dollars and 59 cents, which were particularly set forth. *Henry F.* averred, that the conveyances made to him by *Abraham F.* and *John F.* were *bona fide,* and for an adequate consideration, &c.

The defendants, *William T. Robinson, Abraham F.,* and *John F.,* put in their answer, on the 10th of *January,* 1810; they admitted the conveyances and assignments made by them as stated by the plaintiff, but denied all fraud in the disposition of their property; and averred, that they sold their real and personal estate, *bona fide,* without fraud, and for a valuable and adequate consideration. They denied a fraudulent arrangement with *Henry F.,* or any other person, to protect their property; but stated that the conveyances of a principal part of the real estate were after the suits were commenced by the plaintiff, and before he had obtained judgments. That on the 10th of *January,* 1808, they sold and conveyed to *Henry F.,* lands in *Connecticut,* for 10,000 dollars, which sum was carried to his debit, as so much towards advances and responsibilities. They set forth, in a schedule, the real estate and its valuation, as stated by *Henry F.* in his answer; and they stated that the valuation was at the highest price for such lands, and more than could be obtained for them in cash, or on good security; and it was what they supposed the lands to be reasonably worth, free from encumbrances. That the consideration, after deducting the mortgages, consisted of 143,805 dollars and 29 cents, of advances, engagements and responsibilities of *Henry F.* and *Matthew F.,* according to an account presented by them, and believed to be correct; 221,782 dollars and 20 cents, in five notes of *Henry F.,* payable in one, two

three, four, and five years; and the residue in the under-taking of *Henry F.* to pay, in four years, certain confidential creditors of *Robinson & *Franklins*, whose debts amounted to 66,400 dollars, who were named, and their debts specified, and who, they alleged, had notice of the arrangement. That these sums, with the encumbrances, made up the full amount of the valuation of the real estate, as set forth in the sched-ule; and they also set forth the advances and responsibilities of *Henry F.* and *Matthew F.* for them. They stated, that the notes given by *Henry F.* still remained in the hands of *A.* and *John F.*, unpaid. That the agreement and notes were without any condition, and the conveyances absolute and *bona fide*, and without any trust. That *H. F.* had re-ceived various sums, which they specified, amounting to 26,324 dollars and 5 cents, which was all the personal prop-erty that had been received by *Henry F.*, besides a note of *Thomas F.* for 9,508 dollars and 82 cents.

That in *January*, 1807, the defendants, *Robinson & Frank-lins*, and *Minturn & Champlin*, purchased the ship *Manhattan*, and fitted her out for a voyage to *Batavia*, on their joint ac-count. That they and *M. & C.* borrowed of the United Insurance Company 80,000 dollars, by way of *respondentia* on the cargo of the ship, and gave their bond, dated the 5th of *January*, 1807. That *M. & C.* became largely responsi-ble for the defendants, by endorsements, acceptances, lend-ing notes, &c., and after the mortgage to the banks, applied to them, *R. A. F.* and *J. F.*, for security, and they, accord-ingly, executed to *M. & C.* two deeds of assignment, one on their half of the *Manhattan* and her cargo, and the other of the ship *Milwood* and her cargo, owned by the defendants, and of the policies of insurance thereon. The first assign-ment expressed, that the ship and cargo were to be held by *M. & C.* for their indemnity, subject to the *respondentia* bond; and each assignment contained a proviso, that if, at the expiration of three months after the arrival of the ships, the defendants should pay all the engagements which *M. & C.* had or might come under for them, or either of them, and all the debts due *by them, or either of them, to *M. & C.*, and should indemnify *M. & C.* for all damages by reason of such engagements, then the assignments should be void; and in case of the failure of the defendants so to do, they gave au-thority to *M. & C.* to sell the ships and cargoes, &c., and apply the proceeds to their own payment and indemnity, after first satisfying the *respondentia* bond. That *M. & C.* accepted bills drawn on them by the supercargo, at *Batavia*, for the return cargoes, to the amount of 72,575 dollars and 50 cents. That the ships arrived at *New-York*, with their cargoes, and were entered by *M. & C.* at the custom-house,

1817.

HENDRICKS
v.
ROBINSON.

[ * 290 ]

[ * 291 ]

as their own property; and they paid the duties and premiums of insurance, and also for the disbursements and expenses, the particular sums so paid being set forth in their answer. That the defendants *Robinson & Franklins* wholly failed to pay and indemnify *M. & C.*, according to the condition of the assignments, whereby they became absolute; but, on account of the embargo, *M. & C.* made no sales, and the cargoes were stored. That on the 24th of *March*, 1809, the defendants agreed with *M. & C.* that they might sell the *Manhattan* for 22,500 dollars, crediting the defendants with one half of the amount, and, in *April* following, they agreed that *M. & C.* might take to themselves the *Milwood* and her cargo, and their half of the cargo of the *Manhattan*, at certain prices mutually agreed upon, and the amount was passed to their credit with *M. & C.* That the prices so allowed by *M. & C.* the defendants believed to be the best that could be obtained.

These defendants further stated, that when they stopped payment, they owned three fourths of the ship *Savage*, and the whole of the ship *Huntress*, and the schooner *Hope*, the two latter vessels being expected on their return home. That wanting to provide money to meet the expenses of these voyages, and to obtain the necessary aid and credit, on their arrival, the defendants, in *January*, 1808, applied *to *J. & T. Walden*, to whom they were already indebted, for an advance of 30,000 dollars; and it was agreed between them, that *J. & T. Walden* should advance that sum, and the defendants assign to them the above-mentioned vessels and their cargoes; that *J. & T. Walden* were to enter and pay the duties on the vessels and cargoes on their arrival, and sell them, on commission, to the best advantage, and to account for the proceeds, after deducting all advances, responsibilities, losses, commissions, &c. That *J. & T. Walden* were to hold these vessels and their cargoes, for their indemnity against all engagements and responsibilities, incurred for *Franklin, Robinson, H. & J. F.*, and for all expenses, &c. That the supposed amount of sales was estimated at 120,000 dollars, on which *J. & T. Walden* were to receive a commission of 5 per cent. on the net sales; and for advances, loans, and insurances, they were to charge such interest, commission, and premium, as they should be obliged to pay, and upon all other advances they were to be allowed lawful interest. That pursuant to this agreement, the defendants, on the 2d and 4th of *January*, 1808, executed conveyances of the property to *J. & T. Walden*. That the bills of sale were absolute on the face of them, but understood to be made for the purposes aforesaid, and they were so made *bona fide*, not with any view to defeat creditors, or for any

230

fraudulent purpose; and the defendants annexed to their answer an account current between them and *J. & T. Walden*, to the 31st of *December*, 1808.

The defendants *Minturn & Champlin* put in their answer on the 12th of *October*, 1809, to which were annexed schedules of their accounts and transactions with the *Franklins*; and after charging their advances and commission, according to the agreement with *Robinson & Franklins*, they made a balance of 359 dollars and 21 cents due to them from *Robinson & Franklins*. They stated their transactions with *R., A. F. & J. F.*, substantially, as set forth in the answers of the *Franklins*, and denied all fraud or collusion, *&c., and averred that the assignments were made to them *bona fide*, for the purposes above mentioned. That the notes charged in their account were given for their responsibilities for *Robinson & Franklins*, and for renewals of from time to time, &c. That the commissions were usual, and such as the *Franklins* agreed to pay.

[ * 293 ]

The defendants *J. & T. Walden*, in their answer, filed the 12th of *October*, 1809, stated particularly the transactions between them and *A. F. & J. F.*, and substantially, as contained in the answer of the latter. They stated, also, that on the 11th of *February*, 1808, they borrowed of *J. & E. Ferris* their promissory notes for 7,000 dollars, for the *Franklins*, for which they were to pay a premium of two and a half per cent. That further aid being necessary to meet the expenses on the arrival of the *Huntress*, they borrowed of *Benjamin Pell* his promissory notes for 15,000 dollars. That *Benjamin Pell & Son* held a bill of exchange, drawn by *John Franklin*, and endorsed by *Franklin, Robinson & Co.*, for 2,500 pounds sterling, which had been returned protested for non-payment, and the drawer and endorsers made liable for the amount. That on the second of *March*, 1808, *J. & T. Walden* entered into an agreement with *B. Pell*, reciting that he having advanced to *J. & T. Walden* his notes for 15,000 dollars, to be received from time to time, &c., they, *J. & T. Walden*, therefore, guaranty to him the payment of the said bill of exchange, to the extent only of the funds which they may have, on a settlement of accounts, due to *A. F. & J. F.* That they, *J. & T. Walden*, believed at that time, that *A. F. & J. F.* would turn out to be insolvent, and this guaranty was the only terms on which the loan was obtained, and by means of which the notes of *Ferris* were paid off. That they claimed of *A. F. & J. F.* all that they, *J. & T. Walden*, were obliged to pay *B. Pell*, in consequence of this guaranty. In a schedule to their answer, they set forth their account with *A. F. & J. F.* And they *stated that the value of the property assigned fell short of 120,000

[ * 294 ]

1817.

HENDRICKS
v.
ROBINSON.

dollars, as estimated, whereby, unless an adequate compensation was allowed them, they would be deprived of a great part of the consideration on which they entered into the agreement with the *Franklins;* and they, therefore, asked the commission on the full sum of 120,000 dollars, or the usual mercantile commissions on all their transactions with the *Franklins,* or some other just and reasonable compensation.

In their answer to the supplementary bill, on the 18th of *June,* 1813, *J. & T. Walden* set forth an account of the sales and disposition of the property, since their answer to the original bill, and in a schedule annexed, exhibited a particular account of the result of their trust, to the 31st of *March,* 1813, by which it appeared, that there remained in their hands 13,732 dollars and 2 cents, being the whole proceeds of the property, and subject to the payment of their commissions, which they stated to be at least 6,000 dollars, and to all their responsibilities incurred for the *Franklins;* and they stated that they were ready to account, and after being paid what was due to them, and exonerated from all their responsibilities, they were ready to pay the residue of the proceeds, &c.

The other defendants also filed their answers, and answers were also put in by the defendants, and by the assignees of the defendants who had become insolvent, to the supplemental bill, filed in *January,* 1813.

The material parts of the proofs and exhibits in the cause are sufficiently stated in the opinion of the Court.

The cause came on to be heard in *October* last, and the argument occupied the Court for several successive days.

*Wells, Brinkerhoff,* and *Baldwin,* (*Hoffman* also,) for the plaintiff.

[ * 295 ]

*Harison, T. A. Emmet,* and *Colden,* for the assignees or *W. T. Robinson, A. Franklin,* and *John Franklin,* and *Henry Franklin,* and in support of the deed to him.

*D. B. Ogden, Harison,* and *T. A. Emmet,* for the defendants *Minturn & Champlin.*

*Griffin,* and *J. Radcliff,* for the defendants *J. & T. Walden.*

*Boyd,* for the representatives of *Pell & Son.*

*January* 20th.    The cause stood over for consideration until this day, when the following opinion was delivered by

232

THE CHANCELLOR. The plaintiff files his bill as a judgment creditor of *W. T. Robinson*, and of *Abraham* and *John Franklin*, to set aside, as fraudulent, certain conveyances of the real estate of *Abraham & John F.* to *Henry Franklin*. The object of the bill is also to set aside certain assignments of their personal estate to the defendants *Minturn & Champlin*, and *Jacob & Thomas Walden*, or that those assignees of the personal estate may account for the proceeds, and that the same may be applied towards the satisfaction of the judgments of the plaintiff.

The detail of these transactions, and the number of parties whom they necessarily affected, and who were called before the Court, have rendered the pleadings uncommonly complicated and voluminous. A great variety of facts, and many of them very remotely connected, have been brought into the history of the case, and to bear upon the points which have arisen. Several of these points are extremely important, not only in consequence of the amount of the property in question in this case, but as they bring into discussion the relative rights, generally, *of creditor and insolvent debtor, in respect to the control and disposition of the estate of the latter.

I shall proceed to examine each point in its order, and shall endeavor to do it with all possible brevity and simplicity.

1. The first objection to the suit is, that the plaintiff, as a judgment creditor, cannot, singly, and without uniting the other judgment creditors with him, sustain the bill.

I have no doubt that this Court can and ought to lend its aid, whenever that aid becomes requisite, to enforce a judgment at law, by compelling a discovery and account, either as against the debtor, or as against any third person, who may have possessed himself of the debtor's property, and placed it beyond the reach of an execution at law. The preliminary step which seems to be required is, that the judgment creditor should have made an experiment at law, and bound the property, by actually suing out execution. (*Angell* v. *Draper*, 1 *Vern.* 399.; and see a decision by Lord *Nottingham*, cited in 1 *P. Wms.* 445. *Stileman* v. *Ashdown*, 2 *Atk.* 476. *Shirley* v. *Watts*, 3 *Atk.* 200.) The objection, however, in this case, is not to want of power in the Court, but that the plaintiff is not entitled to its aid, because he comes here for himself alone, and does not allege that he is suing in behalf of himself and the other creditors. One creditor may undoubtedly file a bill, in many cases, in behalf of himself and all the others. (18 *Vesey*, 78. 82.) But how does it appear that the plaintiff knew, when he filed his bill, that there were any other judgment creditors? There are

*Margin:*

1817.

HENDRICKS
v.
ROBINSON.

[ * 296 ]

This Court lends its aid to a judgment creditor, by compelling a discovery and account, against the debtor, or a third person who has possession of the debtor's property, and placed it beyond the reach of execution; but the creditor, before he can have the aid of the Court, must have sued out execution at law.

One creditor may file a bill in behalf of himself and all the other creditors; and where one judgment

1817.

HENDRICKS
v.
ROBINSON.

creditor filed a
bill for himself
alone, it was
[ * 297 ]
sustained; it not
appearing that
there were other
creditors, or if
there were,
there was rea-
son to believe
their judgments
were satisfied,
or, if not satis-
fied, that they
had not taken
any steps at law
to enforce them,
by issuing exe-
cution; and, at
any rate, all
parties concern-
ed in them were
before the Court.

none admitted by his bill. The doctrine in *Leigh* v. *Thomas*, (2 *Vesey*, 312.) and to which I have been referred, is not applicable. In that case, the plaintiffs sued in behalf of themselves and part of the crew of a vessel, for prize money; and by the bill itself, it appeared, there was another part of the crew equally entitled to receive from the defendant a share of the money, though they were no parties to the bill. It *was accordingly ruled, upon demurrer, that the residue of the crew must be joined, to have a general account, for otherwise the defendant might be obliged to account to all the other creditors in succession. The bill here was not only silent, but there was no plea or answer in the original suit, setting up any other subsisting judgment. There was only a disclosure incidentally, and for other purposes, that there were, or had been, judgments in favor of *J. & N. Heard*, and of *J. Mowatt*; and, in the supplementary answer, the defendants, against whom the judgments were rendered, aver that they were satisfied by their agent, *H. F.*, who purchased them. It is only the assignees of *H. F.* who now say that they were assigned over to them as part of his estate, and as being in full force. It does not, however, appear, that executions were ever taken out upon those judgments; and that step seems to have been held necessary, by the cases already referred to, before this Court can aid the execution of a judgment at law. If, however, those judgments were to be considered as unsatisfied, and the party not too late with this objection, it is not necessary to be made in this case; for all the parties that can have any concern in those judgments are now before the Court, and as far as those judgments may be entitled to a preference, or to a ratable distribution of the assets to be procured by this suit, that preference can be given, or that distribution made. I am, however, inclined to think, for reasons which will be disclosed hereafter, that these judgments are not now to be regarded.

Conveyances
by a debtor of
his real estate
declared fraud-
ulent and void,
as against his
creditors.

[ * 298 ]

2. The first important point, on the merits, relates to the validity of the sale of the real estate of *Abraham & John Franklin*, to *Henry Franklin*.

The house of *Franklin & Robinson*, and *John Franklin*, had stopped payment on the 30th of *December*, 1807. They were seised, at that time, of a real estate, worth, according to their own valuation and subsequent sale, *721,663 dollars, subject to mortgages to 219,000 dollars. On the 8th of *January* following, they sold to *H. F.* lands in the state of *Connecticut* for 10,000 dollars, and which sum he passed in his accounts to their credit. Shortly after that sale, but how soon after does not appear precisely, they entered into an agreement with him for the sale of the whole of their real

234

estate; and in the latter part of *February* the parties proceeded to carry that agreement into effect, by fixing the price of the lands, which was deemed, on each side, a fair and adequate one, and which amounted to above the sum of 721,663 dollars. On the 20th *March*, deeds were executed for several parcels of the land, and on the 29th of *March*, the agreement received its entire consummation by the conveyance of the residue of the lands. The conveyances are all quit-claim deeds, without any general covenant or warranty of title; and between the first agreement to sell and its final execution, the *Franklins* had executed several mortgages upon part of these lands to their creditors, to the amount of 70,674 dollars and 51 cents, which encumbrances were assumed by *H. F.*, and the amount deducted from the consideration. The net price, after deducting the amount of all the encumbrances, including those created pending the execution of the contract, was 431,988 dollars, 49 cents, and, according to the answers of the parties concerned, (for they have not given us any other proof on the subject,) this price was paid or secured in the following manner:

(1.) The account of *Henry* against *Abraham* and *John Franklin* was admitted, which amounted to 143,805 dollars, 43 cents. The account is contained in the schedule (A.) annexed to his answer, and consists of endorsements, of bills of exchange, of notes lent, of the guaranty of debts, of acceptances of drafts, of the charge of being surety in an administration bond, of due bills of the grantors, &c. Some of these charges appear, from the account, to have been then due, some not due; some of them to have been *then in suit, and several of them to have arisen during the course of the negotiation for the sale of the lands. The grantors state in their answer, that when they stopped payment, the actual and contingent demands of *H. F.* amounted to 120,000 dollars. This long account in the schedule (A.) is quite loose and confused, without satisfactory precision as to dates and circumstances, and without any testimony whatever to support any one *item*. Not a paper is produced which *H. F.* may have been obliged to take up, nor a voucher exhibited of any one payment. The contingent responsibilities were considered and liquidated as so much *actual* debt, though there is no proof that any responsibility was ever incurred. Thus, for instance, one *item* in the account is 7,000 dollars, the amount of an administration bond, in which *Henry* was surety for *J. F.*, but we have no evidence that there was any breach of the condition of that bond.

(2.) The next head of the payment of the consideration, consists of a naked promise of *H. F.* to pay the grantors, in four years, 66,400 dollars, to be appropriated to the pay-

1817.

HENDRICKS
v.
ROBINSON

[ *299 ]

ment of the debts of certain confidential creditors, whose names and debts are mentioned in the agreement. There was no promise to pay interest on that sum, and this amount of the consideration was, consequently, on a credit of four years without interest. Nor is there any other evidence than this agreement, and the answer of *A. & J. F.*, of the existence of such confidential debts, or that notice was ever given to those creditors of this provision in their favor.

(3.) The remainder of the consideration, amounting to 221,783 dollars, 6 cents, was settled, by the giving of five notes, payable in one, two, three, four and five years, with interest, but no part of either of these notes has been paid, and a small part only of the sum intended for the confidential creditors. The whole of this immense debt, created by the sale of the real estate, at its fair value, was thus left *to rest upon the personal promise of *H. F.*, without any other security, real or personal.

[ * 300 ]

I cannot resist the impression that this sale carries, on the very face of it, strong indications of fraud, or, in the words of the statute, of a " purpose and intent to delay, hinder or defraud creditors." It was made by a mercantile house, after it had become insolvent, and was pressed by the plaintiff for his debt, and had refused to give him any satisfactory statement of their affairs, and had, accordingly, been sued. It was not necessary to place that property immediately in other hands to manage it and to meet the growing demands upon it. The real estate was not immediately expensive to keep, and did not require those prompt and heavy expenditures incident to the possession of their mercantile capital. It was not a sale safe for themselves or the creditors, or calculated to be soon, and extensively, useful to either. The necessary inference seems to be, that it was a sale in trust, and for the purpose of placing the property beyond the reach of creditors. It is contrary to the ordinary course of dealing, and repugnant to the maxims of common prudence, to alienate such an immense real estate, without payment or security. A case of such a sale on such terms, and at the same time absolute and *bona fide*, is without example. Admitting the account exhibited by the purchaser to be just and true, (and this is a concession which he is not entitled to ask without having made some effort to prove his account,) is it probable that a vendor, selling his real property in good faith, and for a fair price, would be content with a naked promise to pay in four years, and without interest, such an amount of the consideration as 66,400 dollars? Or if he might acquiesce in this, because he was acting only as a trustee for certain favorite creditors, when the absence of self-interest might leave him to be more

indulgent, can we suppose that he would submit voluntarily, and without any pressing necessity, *to leave another part of the consideration amounting to 221,783 dollars, without any other security than simple promissory notes, payable on long credit? And all this extravagant credit was given to a merchant, in most precarious times, who was in the habit (as appears from his own accounts) of almost daily lending and sporting with his responsibilities and credit, to an unlimited extent, and who was, afterwards, involved in bankruptcy, without ever paying a single cent upon these notes! I am induced to conclude that it would violate the dictates of common sense, and equally offend the most popular, as well as the most enlightened sense of justice, to admit such a transaction, under all its attending circumstances, to hold the character of a fair, honest, absolute sale, without any secret trust, or without any views hostile to the rights of the creditor.

It is, indeed, true, that the purchaser and the vendors say, that this was an honest and *bona fide* sale; but do not the facts, which they all admit, outweigh the declaration? And can a mere assertion be compared to the unequivocal language of the facts, and the necessary inference of law?

The conduct of the parties, in other transactions, concerning the disposition of their property, seems to show, that *H. F.* was a *mere agent or trustee of the grantors, for the security and deposit of their property.* On these questions of fraud, all the circumstances, in respect to the dealings of the parties, are to be considered, and will assist in forming a just and accurate conclusion, especially if those dealings are connected with the complicated movements of one entire concern. *Quæ tingula non prosunt juncta juvant.*

The grantors admit, that they, afterwards, agreed with *H. F.* that he should have credit on his notes, for debts due from them on judgments, in proportion as he might obtain or extinguish them; and he made some unsuccessful *efforts with the plaintiff to settle his debt. It is further admitted, that after the purchase and the creation of this enormous debt of *H. F.*, resting on his naked promise, and after the extinguishment of all his demands and responsibilities, actual and contingent, the grantors, on the 26th of *April,* 1808, gave him four notes against *Minturn & Champlin,* to the amount of 7,532 dollars and 38 cents, and which sum, when received, (as it was subsequently,) he was to give them credit for on account. But on what account was he to credit this money, when, only a few weeks before, all his demands had been satisfied, and he had become a debtor to them, to near 300,000 dollars? So, again, the grantors, as well as *H. F.*, admit, that on the 7th of *June,* 1808, he received of *N. H.* 851 dollars of their property, for which he gave them credit.

One would naturally suppose, from these facts, that, instead of being the debtor to such an enormous amount, after all possible demands of his had been silenced, that he continued really a creditor, and was under constant alarm, and induced to exercise uncommon vigilance for the security of himself. There are several other very unaccountable facts in this case. The grantors say, and *H. F.* agrees with them in the fact, that since they stopped payment, he had been making advances and payments to them to the amount of 33,000 dollars, and was constantly supplying their necessary wants, and that this amount of charge was *distinct* from the consideration of the sale ; that is, it was distinct from every kind of demand, down to the 29th of *March*, 1808, which demands went to swell the account of *H. F.* to 143,803 dollars and 43 cents, and which were all absorbed in the consideration of the sale. But it is further admitted, that on the 3d of *April, only five days after the completion of the sale*, the grantors gave *H. F.* an order on *Minturn & Champlin*, for the unascertained balance that might be coming from the assign-

[ * 303 ]

ment of the *ships and cargoes, which had been made to them ; and for that sale of that balance, they were content to receive, and did receive, his notes, payable in one, two and three years, for 45,000 dollars. This was an astonishing instance of accumulated credit. The sale was, however, rescinded, by mutual consent, a year afterwards, when the grantors found it to be an obstacle in the way of their arrangements with *M. & C.* respecting that residuary interest, over which they still acted as owners. The grantors did, also, on the same 3d of *April*, 1808, sell to *H. F.* the unascertained balance that might be coming to them, under their assignments of ships and cargoes to *J. & T. W.* Here, also, they took in payment his notes, for this computed balance, to 21,000 dollars, payable in one, two, and three years. These notes were without interest, and so probably were those given for the balance in the hands of *M. & C.*, though it could not have been known but that those balances might speedily be paid. Here were, then, new sales to *H. F.* following close upon the other, and new credit given to him, to 66,000 dollars, in a very heedless and extraordinary manner, by his single notes, payable at distant periods, without interest !

*Henry F.* claims, through his assignees, the judgments of the *Heards*, and of *Mowatt*, and of the *Millers*, against the grantors ; but here the grantors avow his agency in buying in those judgments, and declare that they were satisfied by him *as their agent.* How can we possibly conclude otherwise, from a combined view of all these circumstances, than that *Henry F.* acted, *throughout*, as the agent, or trustee, of the grantors ; and that the sale of the whole real estate

238

was made purposely to cover the property, and protect it from the process of creditors?

I am, therefore, of opinion, that these conveyances ought to be declared fraudulent and void.

3. The next point is, whether the assignment of the ships *Manhattan* and *Milwood*, and their cargoes, by *A.* & *\*J. F.* to *M.* & *C.* were fraudulent, or valid assignments; and if valid, then upon what principles shall the assignees be held to account?

These assignments were made on the day that the *Franklins* stopped payment. The avowed object was security and indemnity for advances and responsibilities, which had been made, or which might thereafter be incurred. The deeds stated that *M.* & *C.* had made sundry advances and engagements for the grantors; and this is so declared in the answers of all the parties to the assignments, and proved by *Stansbury* and the other witnesses for these defendants, who, taken together, prove the whole substance of the answer. The answer of *M.* & *C.* states, that the notes in schedule (A.) were given for, or in consequence of responsibilities incurred before the assignment; but I do not find that the proof explicitly establishes this. The clear existing responsibilities, when the assignments were made, were the contingent security to one of the banks for 40,000 dollars; the *respondentia* bond for a loan of 80,000 dollars, borrowed jointly with the grantors, on the cargo of the *Manhattan*, then on a voyage to and from *Batavia*; the engagement to meet the drafts of the supercargo on that voyage, which, as it afterwards appeared, amounted to 72,575 dollars, 50 cents; and the engagement to pay, on behalf of the grantors, the bills of *Brown* & *Co.*, of *Bordeaux*, one of which they afterwards accepted to the amount of 6,477 dollars, 87 cents.

These existing engagements were sufficient to justify the call upon the falling house of the *Franklins*, for the assignment of property in pledge; and under the peculiar situation of affairs at that time, it would have been difficult to have measured, with mucn precision, the necessary extent of the pledge. The circumstances under which these assignments were made, are not to be overlooked when we are considering their character and effect. One of the ships and cargoes was owned by *M.* & *C.* jointly *with the *Franklins*. That house had, at the time, stopped payment. A general embargo had just been laid, which was indefinite in point of time, and the reasons upon which it was understood to be supported, gave the public ground to presume, that the foreign commerce of the country was to undergo a long suspension. The event justified the anticipation, for the embargo was continued with unrelaxed severity for near eighteen

1817.

HENDRICKS
v.
ROBINSON

[ \* 304 ]

Assignments by a debtor of personal property to a particular creditor, under what circumstances valid.

[ \* 305 ]

months. What were the *Franklins* to do, in such a new and distressing state of things, with their *East India* ships and cargoes daily expected? By stopping payment, they had avowed, if not an irredeemable insolvency, yet, at least, an absolute disability to prosecute business, and their credit was prostrate. They were not, therefore, able to meet the growing and heavy expenses which such arrivals, under the pressure of the embargo, would necessarily call for. The property must have been abandoned and sacrificed, or confided to the hands of other houses which had funds and credit adequate to the exigency of the case. The state of business arising from foreign commerce was excessively perplexed and alarming, and expedients were then allowable, which, perhaps, no other state of things could require, and which ought to be regarded with an indulgent eye, in reference to that crisis. I have no doubt that the assignment of the *Manhattan* and her cargo was justified under the then state of things, without any other existing responsibilities than what must necessarily have fallen upon *M. & C.*, in consequence of their joint interest in that property. It would equally have been the dictate of necessity and a sound discretion, without reference to the extent of their demands upon the *Franklins*, to have assigned the *Milwood* and her cargo to *M. & C.*, or to some other house equally competent, by its credit and resources, to hold and manage the property, as trustees, for whomsoever it might eventually concern.

*It is not necessary, however, to place the case on this ground, for the *existing* responsibilities were, of themselves, a valid consideration for the assignments; but it appears to me, that if there had been no existing engagement or debt whatever, the *Franklins* had a right to have assigned over the ships and cargoes to *M. & C.* in trust, and, upon terms that were honest and fair, to sell the same, and, as agents or factors, to indemnify themselves for the *general* balance of their account, or for advances and responsibilities *thereafter* to arise. We have no bankrupt system to control the acts of the insolvent merchant, and in the absence of all legal liens, he may make such an assignment as I have suggested, provided it bears the marks of a reasonable discretion, and there is perfect candor and honesty in the intention. The creditor cannot interfere and control the disposition of the property, until he has created a lien by process of law, or without application to this Court, which will make the trustee duly account for the surplus, which may be stayed in his hands; this Court will also make him, as well as the debtor, answerable for any want of integrity in the whole proceeding.

240

I cannot entertain a doubt that the assignments in question were well and *bona fide* made. There were large existing responsibilities, affording sufficient aliment to support the assignments. Those responsibilities were changing every day, by reason of the rapidity and busy circulation of commercial paper. Nor do I doubt, from the fact of the admissions of all parties, and from the testimony of their clerk, that the notes of *M. & C.*, of a date immediately subsequent to the assignments, were only a continuance, under new shapes and renewals, of the prior engagements. Indemnity is a good consideration within the statute of frauds; (1 *Burr.* 474.) and I consider it to be a principle clearly settled, that a debtor, in failing circumstances, may prefer one creditor to another, and assign to *him part of his property in trust to pay the debt. An examination of a few cases will leave no doubt of the existence of this rule. Lord *Holt*, in *Hopkins* v. *Grey*, (7 *Mod.* 139.) recognized the right of a debtor in insolvent circumstances to prefer one creditor to another, as a right then well known, and in daily use; and the modern cases frequently take notice of it.

It was decided by the K. B., in *Estwick* v. *Cailland*, (5 *Term*, 420.) that if a person, having several creditors, convey, by deed, the legal interest in part of his real and personal estate to a trustee, in trust, (after deducting the expenses of the trust,) out of the rents and profits to pay half the surplus to the grantor for his own use, and the residue among certain creditors named in a schedule, without any intention of fraudulently delaying the creditors not named, in obtaining their demand, the deed is valid in law. The debt of the creditor who called the deed in question existed long before the deed, but no suit had then been commenced. The only question raised at the trial was, whether the deed was void under the 13th *Eliz.*, as being made to delay, hinder and defraud creditors. It was decided, that there was no fraud in the case; and Lord *Kenyon* said, and the other judges concurred in the opinion, that it was neither illegal nor immoral to prefer one set of creditors to another. The deed was good as far as the creditors in the schedule were concerned; and it was intimated, that after the schedule debts were satisfied, equity would probably direct the surplus towards satisfying the other creditors. So, in *Nunn* v. *Willsmore*, (8 *Term*, 521.) the grantor conveyed the lease of a farm, and all his effects and debts, to trustees, in consideration of a sum to be paid by one of them, in trust, to dispose of the property, and out of the proceeds to reimburse the trustee the sum advanced, and the other demands of the trustee, and then to pay *such of his debts as the trustees should, in their discretion, think proper,* and the surplus to be held *for the use of his wife. This deed was

1817.

HENDRICKS
v.
ROBINSON.

Assignments of personal property by a debtor in insolvent circumstances, and who has stopped payment, to secure a particular creditor for existing claims and engage- [ * 307 ] ments, as well as for future advances and responsibilities, if made *bona fide*, and under circumstances which leave no doubt of the honesty and fairness of the transaction, will be deemed valid.

[ * 308 ]

1817.

HENDRICKS
v.
ROBINSON.

held good within the 13th of *Eliz.*; that it was neither fraudulent in fact, nor voluntary, from which the law infers fraud, and that, putting the bankrupt laws out of the case, a debtor may assign all his effects for the benefit of particular creditors. So, again, in *Meux* v. *Howell*, (4 *East*, 1.) after a creditor had distrained for rent, the debtor confessed judgment to another creditor, with a view to cover, and make a ratable distribution of his property among all his creditors. This judgment being in fact *bona fide*, and upon good consideration, was held not to be fraudulent within the statute; and Lord *Ellenborough* said, that it was not *every* feoffment, judgment, &c., that may have the effect of delaying or hindering creditors, that is fraudulent within the statute. This is the effect, *pro tanto*, of every assignment that could be made by one who has creditors. Every assignment of a man's property, however good and honest the consideration, must diminish the fund out of which satisfaction is to be made to his creditors. But the feoffment, &c. must be devised *of malice and fraud*, to bring it within the statute. The object of the statute was to prevent deeds, &c., fraudulent in their inception and intention, and not merely such as, in their effect, might delay or hinder other creditors.

The same doctrine has been frequently recognized by the Supreme Court of this state; (3 *Johns. Rep.* 84. 5 *Johns. Rep.* 344.) it is also admitted in the Courts of equity. (*Small* v. *Oudley*, 2 *P. Wms.* 427. *Cock* v. *Goodfellow*, 10 *Mod.* 489. *Phœnix* v. *Assignees of Ingraham*, 5 *Johns. Rep.* 412. 426, 427.) Nor is an assignment, if honestly made, bad, though made to secure against *future*, as well as present, responsibilities. It is altogether a question of intention, and if that be free from fraud, the assignment is not void within the statute. It was accordingly said, by the Supreme Court of the *United States*, in the case of the *United States* v. *Hooe*, (3 *Cranch*, 73.) that *" it is not in itself exceptionable that property should be bound for future advances. It may, indeed, be converted to improper purposes, but it is not positively inadmissible. It is frequent for a person who expects to become more considerably indebted, to mortgage property to his creditor, as a security for debts to be contracted, as well as for that which is already due." The same doctrine was afterwards established by the same Court, in *Chirras* v. *Caig*, (7 *Cranch*, 34.) and a mortgage was held to secure debts contracted afterwards, on account of prior advances or liabilities. This is not a new doctrine. It depends upon the circumstances of the case, how far a subject pledged for a debt may be considered as a security for further loans. This is the amount of the language of the master of the rolls, in *Jones* v. *Smith*; (2

[ * 309 ]

242

*Vesey, jun.* 372.) and in *Demainbray* v. *Metcalfe*, (2 *Vern.* 698.) this extension of the security was admitted. The plaintiff, in that case, pawned jewels to *K.* for 110*l.*, to be redeemed in one year. *K.* delivered them to the defendant as a pledge for 200*l.*, and afterwards borrowed 88*l.* of the defendant, on notes. The chancellor held, that as the defendant lent, as well the 88*l.* as the 200*l.*, on the security of the pledge, though he took notes for the last loan, the plaintiff could not redeem, without paying all that was due to the defendant. Without meaning to sanction this case, in all its extent, it is sufficient to show the existence of a rule which the Court is competent to tolerate. We cannot but perceive the fitness of its application to this case, in which the debtor had the most powerful and justifiable inducements, in the then state of things, to assign his *East India* ships and cargoes, not merely to indemnify against present, but to provide against future advances, and to give the assignees a *lien* for the general balance of their account. It was admitted, in *Green* v. *Farmer*, (4 *Burr.* 2214. 1 *Black. Rep.* 651.) that a factor has a lien for his general balance. When the present assignments were made, no legal lien existed, *nor was a suit commenced; and it is not true, as our law now stands, that the debtor who stops payment, is thereby absolutely disabled from making a disposition of personal property upon the terms of these assignments. There is no such absolute disability going to every assignment, however honest the motive, or provident the act, or cogent the necessity.

I am, accordingly, of opinion, that these were fair and valid assignments, for purposes authorized by law; and the next and only inquiry is, whether there is any surplus which this Court ought to direct towards the satisfaction of plaintiff's debt.

4. *M. & C.* took possession of the ships and cargoes when they arrived, and the same not being redeemed within three months, according to the proviso in the deeds of assignment, the legal title to the property became absolute. The assignees continued to bear all the expenses, and make all the disbursements which the entry and safe keeping of the property required. These charges were exceedingly heavy, amounting to upwards of 167,000 dollars. The difficulties, with regard to this property, were great and increasing, owing to the interdiction of commerce. The cargoes were principally intended, not for home consumption, where the demand was not sufficient, but for the *European* market. At last, in *March*, 1809, the grantees sold the ship *Manhattan*, with the approbation of the *Franklins*, and in *April* following, they became, themselves, the purchasers of what may

1817.

HENDRICKS
v.
ROBINSON.

[ *310 ]

1817.

HENDRICKS
v.
ROBINSON.

[ * 311 ]

A creditor to whom his debtor has assigned property as security for advances and responsibilities, with an agreement that if the property was not redeemed within a certain time, the assignee might sell to pay and indemnify himself, may, after the expiration of the time limited, sell the property for indemnity; and may, with the assent of the debtor, become the purchaser thereof, and of all the equitable or residuary interest of the debtor, at a fair and adequate valuation; and such purchase, if made *bona fide*, and without intent to injure or defraud other creditors, will be valid, not only against the debtor, or *cestui que trust*, but against all other persons.

be termed the equity of redemption in the other ship, and in the cargoes, by an arrangement between them and the *Franklins* as to the price. *M. & C.*, and the *Franklins*, say, that the time of the agreement for the sale of the cargoes was in *June*, but the witnesses say it was in *April*, 1809. I am entirely satisfied that the true time was *April*, and that the parties have named *June* by mistake, though it does not strike me as very material which was, in fact, the true date. The merits *do not turn upon such a circumstance. As the grantors had become confessedly insolvent, without any hope of being able to redeem the property, and as the prices agreed on between the *Franklins* and *M. & C.* were undoubtedly a fair and reasonable valuation of the *Milwood* and the cargoes, I see no objection to the arrangement which was made. The small, trifling retail of, comparatively, a very small part of the cargoes, at something of an advance price, I do not think deserving of much weight, in forming an opinion of the reasonableness and integrity of the sale of the whole cargoes. *M. & C.* had an undoubted right to sell the cargoes, for the purpose of indemnity and payment. That right was given them by the deeds of assignment, and the only question that can be made is, whether they could not themselves become the purchasers, by accepting a release for a valuable consideration, or, what is the same thing, in this case, by the subsequent assent of the grantors, founded on a fair and adequate valuation. I see no objection to this measure, provided it does not interfere with any legal or equitable lien belonging to others, and provided it be done in good faith, without any views injurious to the claims of creditors. The only question that can arise is, Was the release of this residuary interest honest, and for a fair price? The *Franklins*, who were the *cestui que trusts*, are not calling in question the purchase from them by their own trustee, and even if they were plaintiffs, it would not necessarily follow that they could set aside the purchase; for it is well settled, (as I had occasion lately to examine in the case of *Davoue* v. *Fanning*,†) that a trustee may, under certain circumstances, purchase from his *cestui que trust*. There was no trust created by the assignments in favor of any third person. The plaintiff, as a creditor, is not entitled to interfere with the purchase, except upon the ground of fraud, or because he had acquired some legal or equitable *title to the property, prior to the sale. We will now see whether any such pretension to title be well founded.

The plaintiff had issued execution on his judgments at law, the 6th of *February*, 1809, and, on the day following, the sheriff called on *M. & C.*, and showed the executions,

[ * 312 ]

† *Ante*, p. 252.

and asked for the property of the *Franklins* in their posses-sion. I cannot see upon what principle the executions affected or touched the residuary equitable interest of the *Franklins*, in the property which had been assigned. The legal title had become absolute in *M. & C.*, and a mere equity is not within the reach of process at law. I do not know of any case in which a Court of equity has considered an execution at law as binding an equitable right. The idea is altogether inadmissible. If the execution cannot sell, there is no reason why it should affect or bind a mere equity, and the doctrine would be equally inconvenient and absurd. The party's only remedy, if he wishes to prevent the assignment or release of a chose in action, is by application to this Court; and without such aid, the validity of the transfer will depend entirely upon the question of consideration and fraud.

The suing out of an execution is not, perhaps, sufficient, of itself, and without some further act, to stop the alienation of even a legal interest, or of the goods and chattels of the debtor, for a valuable consideration, to a stranger to the execution. A seizure, a taking into possession, an inventory, or some other *act*, amounting to what is understood by an actual *levying* of the execution, is requisite, as I am inclined to think, to create a bar to a subsequent *bona fide* sale. The words of the statute are, that no execution shall bind the property of the goods *but* from the delivery to the sheriff, and it does not appear to have fixed upon that period as *absolutely* binding the goods under all circumstances, but only that the *lien* shall not be carried *further back* than that period. In the case of *Lowthal* v. *Tonkins*, (1740. 2 *Eq. Cas. Abr.* 380. pl. 14.) *the question came before Lord *Hardwicke*, how far an alienation of goods, by the debtor, subsequent to the delivery of the execution to the sheriff, was valid, and his opinion clearly was, that it was not necessarily void. He observed, that neither before nor since the statute of frauds, was the property of the goods altered, but continued in the defendant, until execution *executed*. The meaning of the statute was, that after the writ was delivered to the sheriff, if the defendant made an assignment of his goods, unless in market overt, the sheriff might take them.

It appears to me, therefore, upon a consideration of all the facts, that *M. & C.* are accountable only for the proceeds of the property assigned, according to the price of sale agreed upon between the parties; and, for the same reason, they are entitled to the commissions which were agreed to be allowed them. This was a question entirely between the parties to the assignments; they were competent to settle the compensation upon fair and reasonable terms; the cred-

---

1817.

HENDRICKS
v.
ROBINSON.

The mere equitable interest of a debtor in property assigned as security cannot be reached by process at law, or bound by execution.

The mere suing out of an execution does not create a lien on goods and chattels; but there must be an actual levying of the execution, to create a bar to a subsequent *bona fide* sale.

[ * 313 ]

The property in goods is not changed until the execution executed.

itors of the *Franklins* have nothing to do with that allowance, any further than to see that it was honestly allowed, and not for colorable and fraudulent purposes. If the allowance had been unusually and extravagantly high, it might then have been evidence of a fraudulent appropriation of property. But the case does not warrant that inference, and we have no evidence to prove that the commissions allowed were more than a just and adequate compensation. If there be no inference of fraud, the *quantum* of the allowance cannot be called in question.

Upon the whole, I am of opinion, that the defendants *M. & C.* are to account for the property assigned, according to the sales and charges contained in the account current annexed to their answers. This account has been examined

[ * 314 ]

and ratified by the *Franklins;* and it appears to *me to be sufficiently proved by the witnesses adduced on the part of *M. & C.*, all of whom appear to be competent for that purpose, and to have no interest in the controversy between the plaintiff and those defendants. By that account, the defendants *M. & C.* have duly accounted, and there is a small balance in their favor. If, however, the plaintiff wishes to have that account further investigated before a master, he must do it at the peril of costs, and upon the admission of the principles of this decree ; but I do not, at present, see any reasonable cause why the defendants *M. & C.* should be subjected to that burden.

5. The next branch of this complicated cause relates to the proceeds of the assignment of certain vessels and cargoes to *J. & T. Walden.*

These assignments were made to procure a loan of money, and for the security of existing responsibilities. The *Franklins,* when they stopped payment, applied to the *Waldens* for a loan of 30,000 dollars, and the loan was effected, upon receiving an assignment of two thirds of the ship *Savage,* and the ship *Huntress,* and the schooner *Hope,* and their cargoes, by way of security for the loan, and for pre-existing engagements. The deposit may seem large, being property estimated at 120,000 dollars, for debts and advances to 44,000 dollars, and a remotely contingent security to the bank for 15,000 dollars. But, as has been already observed, the times were disastrous, and full of peril to all commercial speculation and dealing, and the expenses incident to the entry, storage and security of foreign cargoes, necessarily great. The *Franklins* had no means of their own ; they, therefore, acted discreetly in borrowing money upon that property, and in consigning it, by way of indemnity, to be sold upon commission. The only real question that can arise in respect to this transaction is, Have these trustees duly accounted?

Both parties agree as to the terms of the trust, notwithstanding the assignments were absolute.

*One principal point in the case is, whether the claimant, under the guaranty of the 2d of *March*, 1808, (and who appears to be now the assignee of *Coffin & Pell*,) is entitled to be paid out of the surplus, in preference to the plaintiff. I am of opinion that he is entitled to that preference, provided the engagement was fairly and *bona fide* made at the time. The *Waldens* were in possession of the property by an assignment absolute on its face; and by their agreement with the *Franklins*, they were to receive indemnity from the property against all their existing and future engagements on behalf of the grantors, and especially against such as should necessarily arise in the management of the property. They effected a loan of money for the purposes of their trust from *Benjamin Pell*, upon the condition of giving him a guaranty of the debt he held against the *Franklins*, to be paid out of the proceeds of the assignments. This was considered as an advantageous loan upon that condition; and the question is, Shall this Court divert the proceeds from the fulfilment of that guaranty to the payment of the plaintiff's debt? The plaintiff, at the time of this guaranty, had commenced his suit, but had done nothing more. The debt of *Benjamin Pell* stood upon equal pretensions, and the debtors might have elected to have given a preference to either. The plaintiff is not entitled to the aid of this Court in pursuit of those proceeds, until all prior legal and equitable liens are satisfied. It may be that the *Waldens* had no right, under the agreement, to bind the *Franklins* by such a guaranty. Suppose this were to be admitted, yet the plaintiff does not stand here as the representative of the *Franklins*, to litigate every charge against them upon strict legal principles. The inquiry is, whether *Pell* did not acquire, by that guaranty, an equitable lien, which the plaintiff ought not to be permitted to question. He lent his money on the express condition of such a guaranty. It was a condition which he had a right to prescribe. The loan *was deemed beneficial for the interest of the *Franklins*, even upon that condition, and they have never complained of it. It was the appropriation of so much of their property towards the discharge of a just and *bona fide* debt. The *Waldens*, who made this guaranty, or pledge, of these proceeds, had, at the time, the absolute legal title to the property; and the loan thus procured, went to answer the purposes for which the trust was created. The claim of *Pell* has, accordingly, an equity, in respect to these proceeds, which the plaintiff has not, and it ought to be preferred.

The next disputable *item* in the account of the *Waldens*,

1817.

HENDRICKS
v.
ROBINSON.

[ * 315 ]

Where *F.*, a debtor in embarrassed circumstances, made an assignment (on the face of it absolute) of property to *W.*, a creditor, as security for a new loan of money, and for existing claims, and, also, for indemnity against existing and future engagements, especially all such as should arise in the management of the trust; and *W.*, for the purposes of the assignment, effected a loan of money of *P.*, on condition of guarantying to him a debt due to him from *F.*, to be paid out of the proceeds of the property so assigned; it was held that *P.*, by lending his money to *W.* on this guaranty, acquired an equitable *lien* on the proceeds of the property,

[ * 316 ]

and was entitled to be paid his debt out of the proceeds in the hands of *W.* in preference to other creditors.

HENDRICKS
v.
ROBINSON.

is the charge of commissions, which was a matter of agreement at the creation of the trust, and if made in good faith, as we have no reason to doubt, the agreement is not now to be disturbed. The parties were competent to judge for themselves at the time of the original agreement, what would be a suitable compensation under the then existing circumstances; and a third person can have no right to interfere, unless the allowance be so disproportionate to usage and the nature of the service, as to be evidently a colorable disposition of property to defraud creditors.

There is a question also before me, as to the competency of the proof offered by the *Waldens* in support of their answer. But after settling the principles in all the disputed points arising on stating their accounts, they can, if necessary, be put to the proof of their account in the examination before the master. I presume, however, that after this opinion, the plaintiff will not think it necessary to pursue an inquiry before the master, as it is understood that there will be no surplus remaining to which he would be entitled.

I shall, accordingly, decree that the several conveyances of real estate from *Abraham & John Franklin* to *Henry Franklin*, as stated in the pleadings, and made in *the months of *February* and *March*, 1808, be declared fraudulent and void; and I shall reserve the question of costs, and all further questions, until the plaintiff shall have had an opportunity of applying, if he shall so elect, for a reference to a master to take and state, upon the principles of this opinion, the accounts of *Minturn & Champlin,* and of *Jacob & Thomas Walden*, as assignees of the vessels and cargoes in the pleadings mentioned.