BENJAMIN W. ARNOLD, assignee &c., appellant,

*v.*

JOHN W. HAGERMAN et al., respondents.

BENJAMIN W. ARNOLD, assignee, appellant,

*v.*

THE SECOND NATIONAL BANK OF RED BANK, respondent.

1. A person *bona fide* and casually told his partner that he was worth $30,000 above his debts; afterwards he purchased his partner's interest in the partnership, agreeing to indemnify him against the firm debts; subsequently it appeared that in fact his debts exceeded his assets.—*Held,* that the partner had no right to consider the statement as entering into the negotiations for the purchase, and could not, because of its inaccuracy, rescind the transfer.

2. Such a transfer may not be rescinded on the ground that the purchaser turns out to be unable to fulfill promises which he honestly made during the negotiations for the purchase.

3. If the circumstances show that one partner is buying out the interest of his copartners for the purpose of securing the partnership property to pay his individual creditors, and those circumstances are known to the copartners, they have no standing to impugn the transaction on that account.

4. Upon discovery of fraud which has induced a contract, the defrauded party must promptly elect whether he will rescind or not; and if he then evinces an intention not to rescind, the contract becomes, as to him, irrevocably established.

5. The practice, in equity, of applying partnership property first to the liquidation of partnership debts, rests upon the presumed intention of the partners themselves, and is primarily considered as their right against each other. Consequently, if by their agreement the partnership be dissolved and the property be assigned to one of their number or to a stranger, as his own, without reservation of the right, the right would ordinarily be gone, and the practice would not be pursued.

6. Out of this right of partners *inter sese* has sprung the corresponding equity of partnership creditors.

7. Generally speaking, this equity of creditors continues only so long as the right of the partners against each other subsists; but if the partners have put an end to their own rights, with intent to hinder, delay or defraud the partner-

Arnold *v.* Hagerman.

ship creditors in pursuit of this equity, then this equity of creditors may still remain.

8. If a firm and all its members be insolvent, and the insolvency be patent to all the members, a transfer of the partnership property to one of the firm will be considered as made with intent to hinder, delay or defraud the firm creditors.

9. A *voluntary* conveyance of all the firm property to one of the partners is invalid as against existing firm creditors.

10. A covenant from which the covenantor may be relieved, on account of the failure of a transfer for which it was made, is not a good consideration within the statute of frauds.

11. An assignment for the benefit of creditors, made by a partner to whom all the partnership property has been transferred in fraud of partnership creditors, will be treated in equity as an assignment of that property for the benefit of partnership creditors in preference to the individual creditors of the assignor, when it appears that these latter creditors, before proving their debts under the assignment, were apprised of circumstances which disclosed the fraud practiced upon the partnership creditors.

12. An assignment for the benefit of creditors is not invalid under the statute of frauds, because, as a necessary incident to the execution of the trust, it delays creditors and prevents their obtaining preferences by judgment.

13. Upon a bill filed by a partnership creditor to secure for himself a lien by execution upon partnership assets, it appeared that the complainant was entitled only to have those assets ratably distributed among all partnership creditors.—*Held*, that, as the bill brought in the necessary parties, stated the necessary facts, and contained an appropriate prayer, the decree might be so framed as to secure such distribution.

---

On appeal from two decrees advised by Vice-Chancellor Bird, who filed the following conclusions in the case of the First National Bank :

Farr, Hagerman and Fielder formed a copartnership. Farr's interest was one-half, the others each one-fourth, each of whom gave a note to Farr for $7,500, with the agreement that said notes were to be paid out of their respective shares of the profits of the business. The name of the copartnership was J. C. Farr & Co., and this firm was the successor to the firm of Sullivan & Co., the debts of which firm were assumed by the former. The firm of J. C. Farr & Co. continued in business a little over three months, when, on October 29th, 1883, it was dissolved. The

Arnold *v.* Hagerman.

dissolution was effected in this way: Farr was largely indebted individually to creditors living in Albany and elsewhere, because of which he was unquestionably embarrassed. He informed his copartners that he was indebted individually, without giving them any statement in detail of the extent of his liabilities or the value of his assets, but assuring them that he was free from any real embarrassment, and desiring them to transfer to him all their interest in the firm of J. C. Farr & Co. He prevailed upon them, by assurances, to believe that if they would make such transfer, he could not only manage his own individual creditors and discharge all his own individual liabilities, but could also pay all the debts of the said firm of J. C. Farr & Co. I have no doubt but that he prevailed upon them by representations which were wholly false, whether he knew it or not, but that they, on their part, believed his representations to be true, and consequently that they acted in good faith.

The individual liabilities of Farr, which he assured his copartners he could so easily control, were over $79,000, and his assets did not exceed $50,000, and most probably not over $40,000. The complainant insists, that, after making proper allowance for the liabilities of the firm of J. C. Farr & Co., the assets of said firm assigned to John C. Farr were in excess of said liabilities; but this is not so material, for, as I understand the case, on the last showing, after increasing his assets by all of those which he took from said firm, his liabilities were about $40,000 in excess thereof, and when the value of said assets came to be tested by a sale, the excess of liabilities was greatly increased.

Before and at the time of the transfer of the assets of the firm of J. C. Farr & Co. to John C. Farr, said firm was largely indebted to the complainant. Since the transfer, the complainant obtained judgments on its several claims. It files its bill, alleging that the transfer to John C. Farr was fraudulent, and asks to have it declared void.

In considering this question, the rights of third parties are to be taken into account; for, as the sale was made to Farr on October 29th, he, on November 30th, of the same year, made

Arnold *v.* Hagerman.

an assignment under the statute for the equal benefit of all his creditors, and certain creditors of Farr filed their claims with the assignee. Hence, if upon inquiry I find that the sale to Farr by his copartners was fraudulent, I must then inquire whether the rights of third parties have so intervened as to prevent the court from setting aside the sale.

In considering the question of fraud, I shall regard the act of each and all the persons in copartnership, and the copartnership itself, in dealing with the partnership property, as subject to the same legal rules as an individual; I shall hold that one of them cannot transfer partnership property without the knowledge of the others in violation of the rights of creditors; I shall also hold that one cannot make such transfer with the consent of the others as to the transfer, though they may be ignorant of the fraud; and I shall likewise hold that the transfer in fraud by one cannot be upheld, even though the others join therein ever so innocently. The intended fraud of the one vitiates it as to all. The whole transaction is permeated by the wrong. Were it otherwise, the fraud-doer need only to bring to his aid some innocent and helpless person to secure all the benefit of the greatest fraudulent conception.

Was the transaction in this case fraudulent? I think it was in equity, as to the creditors of J. C. Farr & Co. Why so? First, because it was a well-devised plan on the part of John C. Farr to place all this partnership property beyond the reach of the partnership creditors by having it transferred to himself, so as to make it first subject to the payment of his individual debts. And, second, because, by means of such transfer, the identity of the property would soon be lost, and the partnership creditors would be without hope or redress until Farr's creditors should all be satisfied. But most especially, in the third place, because Farr knew, or ought to have known, the result of the transaction, and is therefore chargeable with knowledge, and, consequently, with the intention of committing the wrong which necessarily ensued. Most certainly Farr knew that he was hopelessly insolvent. If the assignment which so swiftly followed the dissolution of the partnership, at his earnest instance, was not then

Arnold *v.* Hagerman.

contemplated, the equivalent thereof most undoubtedly stared him most obtrusively in the face. His Albany creditors were anxious; they were waiting upon him in person; they sent a committee to visit him at his place of business and at the place where he was carrying on the partnership; they had that committee inventory all his property, including this partnership property; and they continued their zeal until the assignment was reached, and to the individual assets were added a great many thousands of dollars' worth of goods which had been partnership assets. •

But it is said, that Farr assumed the payment of the debts of the firm, and that the creditors of the firm can share in the distribution. That may be; such course might be very acceptable to the individual creditors, as where $10,000 worth of individual assets should be increased in value by the addition of $50,000 worth of partnership assets. But that is not the question. If the transaction were honest, the consequences cannot control, but if dishonest, then the partnership creditors have a right to have it declared void. And on this ground, I think the bill is properly filed.

What as to the rights of third parties? It is said that the creditors of John C. Farr have filed claims with the assignee of Farr, and that it would be doing great injustice to them to withdraw this large amount of assets from the hands of his assignee, since the creditors cannot be restored to their original condition. In the first place, I would observe that every creditor in such case files his claim without knowing, to a very great degree of certainty, what percentage of his claim will be paid. It often happens that the fairest promises produce the least percentage. It often happens that assets, which are inventoried at large values, dwindle to insignificance, either through unforeseen depreciation of values, forced sales, or the claims of others to such assets. I think it cannot be said that in such case the rights of third parties stand in the way. They have given nothing, and it seems to me that in the eye of the law they cannot be heard to say that they have surrendered anything. If the plea of a creditor, or in behalf of a creditor (which is the case here), can prevail on such grounds, then it would be in vain for the owner of goods

Arnold *v.* Hagerman.

to assert his rights to them after administration had been once begun by an assignee, and claims had been presented.

But, secondly, if the creditor in such case was misled by the false appearances of assets, he would not be without remedy. He would not be bound to stand and accept the consequences of a fraudulent device of his debtor. There cannot be a doubt but that he could obtain relief and be discharged from the statutory obligation in which he is placed by reason of filing his claim. In such case, it would be a question between the creditor and his debtor, and who can doubt but that if it appeared that the debtor had made a fraudulent accession to his assets, and thereby induced his creditors to file their claims, the court would at once discharge the creditor from the legal consequences of filing his claim. Hence, I do not find that the rights of third parties prevent this court from declaring the sale to Farr by his copartners void.

But it is said that the complainant is in laches in not filing its bill sooner. The assignment was made November 30th, and the bill was filed March 10th following—within three months and ten days. But the complainants did not recover judgment on any one of their several claims until January 3d next after the assignments, so that the time which elapsed before the commencement of this suit after it might have been commenced was only two months and seven days. I can find nothing in this to warrant the charge of laches. But it is insisted that a judgment was not necessary in such case. I think the counsel are in error in this. Whatever may be the law elsewhere, it seems to be settled in New Jersey that a creditor has no standing in equity to set aside the fraudulent transfers of his debtor until he has recovered a judgment, except in the case of the death of the debtor and there is no administrator, or if there be one where the creditor files his claim and it is not disputed. *Hunt* v. *Vanderveer, MS.,* is an illustration of the former condition, and *Haston* v. *Castner, 4 Stew. Eq. 697,* of the latter. The case of *Hunt* v. *Vanderveer* was before Vice-Chancellor Van Fleet, and I understand that he sustained the bill, although no judgment had

been obtained by the creditor, because there was no one against whom he could proceed at the time of filing his bill.

I will advise a decree declaring the sale to Farr void. The complainant is entitled to costs. The questions raised with respect to the equitable rights of creditors to the funds in the hands of the receiver will be considered upon an application for the distribution of them. Then all who are interested can have a fuller opportunity of being heard.

And also the following conclusions in the case of Hagerman and Fielder:

This case was heard with that of *Second National Bank of Red Bank* v. *Farr et al.* I have taken still more time to consider this than that. And, after all, my mind is, that the whole transaction was conceived in fraud, and was, by fraudulent misrepresentations, carried through. However much Mr. Farr may have been convinced of his ability to accomplish what he said he could, it was the merest delusion, as every step taken by him after the purchase of the interests of his copartners proved. This is, in the law, a fraud which cannot be upheld by the courts. I will advise that the sale be declared void. As the property has been converted into money, the proceeds must all be accounted for. When an application is made for distribution, other questions which have been raised will be determined.

The complainants are entitled to costs.

*Mr. Gilbert Collins,* for the appellant.

*Mr. A. C. Hartshorne,* for Hagerman and Fielder.

*Mr. John C. Applegate* and *Mr. Fred. W. Hope,* for the Second National Bank.

The opinion of the court was delivered by

Dixon, J.

On July 17th, 1883, John C. Farr, having a lumber business in Hoboken, and a wood manufacturing business in Asbury

Park, formed a copartnership in the latter business with John H. Hagerman and John S. Fielder, under the name of J. C. Farr & Co., to continue for four years. Under their agreement Hagerman and Fielder each gave to Farr his note for $7,500, and thereupon property already in the business at Asbury Park became the capital of the new firm, owned one-half by Farr and one-quarter by each of the others. Each partner was to draw out a stated sum annually, and the profits and losses were to be divided in proportion to their respective interests, but the profits accruing to Hagerman and Fielder were to be applied toward the payment of the notes aforesaid. The firm also assumed the debts of Sullivan & Co., a concern of which the new partnership was said to be a continuation.

On October 29th, 1883, the new firm, being embarrassed, dissolved, and Hagerman and Fielder assigned all their interest in the business and property of the partnership to Farr, Farr surrendering to them the notes aforesaid and agreeing to pay the debts owing by the firm, and which were assumed by the firm from the firm of Sullivan & Co., and to save Hagerman and Fielder harmless therefrom.

On November 30th, 1883, Farr assigned all his property to Benjamin W. Arnold for the purpose of securing to his creditors an equal distribution of his property and effects, pursuant to the directions of the statute of this state, entitled "An act to secure to creditors an equal and just division of the estate of debtors who convey to assignees for the benefit of creditors," and the supplements thereto.

In January, February and March, 1884, the Second National Bank of Red Bank recovered several judgments in the supreme court against the members of the firm of J. C. Farr & Co. for partnership debts, and caused executions thereon to be levied upon what had been the property of said firm.

On March 3d, 1884, Hagerman and Fielder filed their bill in the court of chancery against Farr, Arnold, the bank and others, to set aside their assignment of October 29th to Farr, alleging that they had induced them to make the same by fraudulent representations, and for a fraudulent purpose; and on March 10th,

13

Arnold v. Hagerman.

1884, the bank filed its bill in said court against Farr, Hagerman, Fielder, Arnold and others to have said assignments, by Hagerman and Fielder to Farr, and by Farr to Arnold, set aside as fraudulent against the creditors of J. C. Farr & Co., so that the property of said firm might be applied to payment of the bank's executions, and also praying that, if necessary, a receiver might be appointed to take charge of the business, assets and effects of John C. Farr, and also those which were of J. C. Farr & Co., to manage, control and dispose of the same under the direction of the court.

These bills and the answers thereto of the defendants above named present the issues now to be decided. The causes have throughout been tried and argued together, since they aim at similar results ; nevertheless their proper decision can be reached only under the guidance of principles which are quite dissimilar.

The complaint of Hagerman and Fielder will be first considered.

The statements relied upon by them as the ground for setting aside their transfer to Farr are, substantially, these, as gathered from the testimony of Hagerman, to whom alone any statements were made by Farr : In a casual conversation about business, held in the streets of New York at an indefinite time, before any discussion was had about Farr's buying out the partnership property, Farr said to Hagerman that his Hoboken business had made $10,000 a year, and that he could pay his debts and have $30,000 left. About the 1st of October, 1883, the creditors of Sullivan & Co. were pressing J. C. Farr & Co. for payment, and Hagerman went to see Farr about it, and told him that unless they got funds to meet the debts their notes would be protested, and they would get on bad credit with the bank. Farr promised that he would borrow $10,000 from Mr. Arnold. Subsequently Farr sent Hagerman word that Arnold would not let him have the money, because he was not satisfied with the Asbury Park business, and wanted a settlement of his accounts (Arnold being a large creditor, mainly of the Hoboken business). Hagerman again called on Farr, who said that his Albany creditors (Arnold being one) were urging him, and that he could get along a great

Arnold *v.* Hagerman.

deal better with them if he had the Asbury Park business in his own name; Hagerman replied that he would be perfectly willing to assign his interest over to him, if it would be of any benefit in getting him out of his trouble, and thought Mr. Fielder would be willing to do as he did; Farr thereupon promised that he would then go ahead and straighten out his affairs, and there would be no more trouble about it; afterwards, a committee of the Albany creditors having come down to Hoboken, the assignment was prepared and executed, with their concurrence.

In these statements there is nothing to warrant the rescission of the assignment. So far as they purported to represent existing facts, the evidence shows that they were all true, except the allegation that Farr was worth $30,000 above his debts. That allegation was made in a casual conversation in the streets of New York before the assignment in question was thought of. It was uttered, we think, *bona fide,* and in view of circumstances quite different from those which presented themselves when the negotiations for this transfer were in progress, and therefore Hagerman and Fielder had no right to regard it as entering into those negotiations. Indeed, it is plain that those negotiations proceeded, not upon the idea that this statement was accurate or reliable, but upon the fear that Farr's assets were unequal to his debts, and his financial difficulties were almost, if not quite, insurmountable. Whatever of these so-called misrepresentations related to the future were but promises honestly made, and Farr's inability to fulfill them does not at all invalidate the assignment.

The fraudulent purpose which the complainants by their bill impute to Farr, as prompting him to obtain this transfer, was a design to secure the property of J. C. Farr & Co. for the payment of his personal creditors, and so to leave the complainants without the means of discharging their obligations as members of the firm. But we have failed to discover any grounds for saying that this was Farr's motive, except such as were substantially known to the complainants when they conveyed to him their interest in the firm property. They may not, indeed, have been apprised of the precise proportion which Farr's assets bore to his liabilities, but they knew that he was insolvent, that

his notes were under protest; and if the court, from the circum-
stances now disclosed, should infer that Farr's purpose was as
charged, the complainants, from the facts then patent to them,
ought to have drawn the same inference. Consequently, if we
are satisfied of the existence of this imputed design, we must also
be satisfied that the complainants were cognizant of and
acquiesced in the scheme. In that case, the transaction did them
no wrong, and they have no standing to complain of its effect
upon others. *Schenck* v. *Hart, 5 Stew. Eq. 774.*

But, even if Hagerman and Fielder were at the time deceived as
to Farr's responsibility and purpose, their subsequent conduct
was such as to deprive them of the right to rescind their transfer
on that account. Upon discovery of fraud which has induced a
contract, the party defrauded must promptly elect whether he
will rescind or not, and if he then evinces an intention not to
rescind, the contract becomes as to him irrevocably established.
In the present case, when Farr made his assignment to Arnold
for the benefit of his creditors, his inability to extricate himself,
and his plan for disposing of his affairs were plainly revealed to
Hagerman and Fielder; yet, so far from repudiating their con-
veyance, upon the ground that this assignment was a fraudulent
perversion of it, they actually took part in perfecting and carry-
ing out this assignment, Hagerman acting as appraiser in making
Arnold's official inventory and valuation, and both Hagerman and
Fielder being employed by Arnold for some weeks afterwards to
manage the Asbury Park business in his behalf. This conduct
shows an election to stand by their transfer, after they were fully
apprised of all the circumstances, because of which they now
seek to avoid it.

Their bill should be dismissed, with costs.

The bill of the Second National Bank raises questions requir-
ing the application of different principles. It insists that the
transfer from Hagerman and Fielder to Farr, as also that from
Farr to Arnold, were void with respect to the creditors of J. C.
Farr & Co., because they were contrived of fraud, covin or col-
lusion, with intent to hinder, delay or defraud those creditors.

The earlier assignment will be first dealt with.

In equity, a partnership is for some purposes deemed a single entity. Thus, when the property involved in the business of a partnership is to be applied by a court of equity to the payment of debts, that property is treated as belonging, not to the persons composing the firm, but to a distinct debtor, the partnership, and is used first to liquidate the debts contracted in the business of that debtor, and only the surplus, if any, is surrendered to the individual partners. This equitable practice rests upon the presumed intention of the partners themselves, and hence is primarily considered as their equitable right against each other. Consequently, since the decision of Lord Eldon in *Ex parte Ruffin, 6 Ves. 119*, it has been generally held that the partners could put an end to this right, and that if, by their agreement, the partnership is dissolved and its property is assigned to one of their number, or to a stranger, as his own, without reservation of the right, the right to have partnership debts paid out of that property is extinct.

Growing out of this right of partners has arisen a corresponding equity in partnership creditors to have their debts first satisfied out of the firm property, which is now deemed a substantial element of their demands. Generally, it may be said that this equity of creditors continues only so long as the right of the partners against each other subsists, and perishes when that terminates; but this is not universally true, for this equity may survive the right to which ordinarily it is attached. In this respect it resembles the claim which the general creditors of an individual have upon his property; it is neither an estate nor a lien; it is ordinarily but a right, by lawful procedure, to acquire a lien during the ownership of the debtor; yet under certain circumstances, that lien may be acquired after the debtor's ownership has ended. This results from the provisions of the ancient statute for the prevention of frauds and perjuries, by force of which, when a person has alienated his property with intent to hinder, delay or defraud his creditors, the rights of those creditors remain as if no alienation had taken place, except against the claims of *bona fide* purchasers for good consideration, without notice.

Equity applies this statute to a partnership, its property and creditors, just as it would in case of an individual; and therefore, while generally it is true that a partnership may defeat the equity of its creditors by the alienation of its property and consequent extinguishment of the right of its partners *inter sese*, yet if the alienation be effected with intent to hinder, delay or defraud the firm creditors by defeating their equity, the claims of creditors will be unimpaired, and the property will be treated as partnership assets, unless it shall have passed into the hands of those whom the statute protects. This doctrine has repeatedly been recognized in the courts of New Jersey. Thus, in *Matlack* v. *James, 2 Beas. 126,* two members of a firm consisting of four persons conveyed their undivided half of land, held for partnership purposes, to an outsider, in payment of their individual debt to him. Chancellor Green, finding that the conveyance was designed to defeat the equitable claim of partnership creditors, adjudged it void, and applied the whole proceeds of the land to paying those creditors. In *National Bank of the Metropolis* v. *Sprague, 6 C. E. Gr. 530, 544,* Mr. Justice Van Syckel, speaking for this court, plainly intimated an opinion (the case not calling for a decision on the point) that an insolvent firm could not defeat this equity of partnership creditors by giving to creditors of the individual members a prior lien on partnership property, and referred to Chancellor Walworth's opinion in *King* v. *Schoonmaker, 3 Barb. Ch. 46, 50,* as supporting that doctrine by sound reasoning. The language of the chancellor thus approved was: "The copartners certainly have the right to dissolve the partnership and divide the property of the firm between them, provided there is no intention of delaying or hindering their creditors in the collection of debts. * * * The case would have been entirely different if copartners, who were insolvent, and unable to pay the debts of the firm, either out of their copartnership effects or of their individual property, had made an assignment of the property of both to pay the individual debt of one of the copartners only. For an insolvent copartner, who was unable to pay the debts which the firm owed, would be guilty of a fraud upon the joint creditors, if he author-

Arnold v. Hagerman.

ized his share of the property of the firm to be applied to the payment of a debt for which neither he nor his property was liable, at law or in equity." So, in *Vandoren* v. *Stickle, 9 C. E. Gr. 331,* affirmed by this court, *12 C. E. Gr. 498,* it was declared that a voluntary transfer by a firm of notes owned by the partnership to the wife of one of the partners, was fraudulent as to partnership creditors, and the notes in the hands of the wife were decreed to be partnership assets. To the like effect is the language of Mr. Justice Depue, delivering the opinion of this court in *Clements* v. *Jessup, 9 Stew. Eq. 569, 572:* "Partnership creditors, in equity, have an inherent priority of claim upon partnership property over individual creditors, and a transfer of partnership property by one partner, with the consent of the other partners, or by all the partners, to pay individual debts, is fraudulent and void as to firm creditors, unless the firm was then solvent and had sufficient property remaining to pay the partnership debts."

The case before us comes clearly within the reach of this principle. At the time of the transfer by Hagerman and Fielder to Farr, the insolvency of each of these persons and of the firm of J. C. Farr & Co., was patent to them all, and, indeed, was the moving cause of the transfer. They all knew that, in the condition of affairs then existing, none of them could meet maturing obligations, and it was in the hope of facilitating an extension or compromise with creditors, that the transfer was made. The transfer embraced all the partnership property. If valid in all respects, it appropriated the shares of Hagerman and Fielder to the payment of the debts of Farr, for which those shares were previously not liable, and left Hagerman and Fielder without any property whatever, as we gather from the testimony, to pay their debts. Inevitably, therefore, by defeating the equity of the partnership creditors, it would hinder them in the collection of their just claims. It is a reasonable inference that these partners intended this manifest effect of their act, and, consequently, the assignment by Hagerman and Fielder to Farr must, according to the terms of the statute, be deemed void as against the partnership creditors.

Not only upon the ground of a common intent to hinder part-

nership creditors, thus inferred from the knowledge which all parties must have had of the necessary consequences of the transfer itself, but, also, upon the ground that the transfer was made without valuable consideration, was voluntary in the legal sense, it should be decreed invalid against the partnership creditors, all of whose debts were then in existence. *Haston* v. *Castner, 4 Stew. Eq. 697.* The consideration nominally given by Farr to Hagerman and Fielder was the surrender of their notes, and his covenant to indemnify them against firm creditors. But according to the testimony, those notes were payable only out of the profits accruing to Hagerman and Fielder from the firm of J. C. Farr & Co., and as that firm had failed and was dissolved without realizing any profits, the notes had become absolutely valueless. Farr's covenant to indemnify does not constitute a valuable consideration, since he may be relieved therefrom on the total failure of the transfer for which it was made. *2 Pom. Eq.* §§ *751, 969; Notes to Basset* v. *Nosworthy, 2 Lead. Cas. Eq. 82; Haughwout* v. *Murphy, 7 C. E. Gr. 531.*

It thus appearing that, notwithstanding this transfer, all the rights and remedies of the creditors of J. C. Farr & Co. remained against the firm property in the hands of Farr, we are brought to consider the assignment to Arnold for the benefit of Farr's creditors.

With respect to this assignment, the following propositions may, I think, be maintained: first, that the creditors of J. C. Farr & Co. are included among its beneficiaries; second, that it conveyed, not only the property of Farr as an individual, but also that which had been the property of J. C. Farr & Co.; third, that it conveyed this latter property subject to the equity of the creditors of that firm; and, fourth, that, so construed, the assignment cannot be successfully impeached by the complainant.

The first proposition is unquestionable. The creditors of J. C. Farr & Co. were all creditors of Farr, for whose benefit the assignment was expressly made.

In considering the second proposition, it must be remembered that, at the time of this transfer, Farr was in reality the owner of the property previously belonging to J. C. Farr & Co.; he

had become so by the conveyance from his partners, which then nobody had disputed; so that the assignment to Arnold of all the property owned by Farr included in its terms the firm property. This was made still clearer by the inventory annexed, which specified, in detail, the property at Asbury Park. Even if the transfer from Hagerman and Fielder to Farr be disregarded, still it will appear that the assignment to Arnold included the property of J. C. Farr & Co.; for, in view of the fact that it purported to convey such property, the conduct of Hagerman and Fielder precludes their denial of its efficiency. They both knew that Farr was about to assign the firm property to Arnold; they both, without objection, delivered over that property to Arnold, in pursuance of Farr's assignment; they both took part in the management of that property under Arnold as assignee, and neither of them raised any question as to Arnold's title, until after creditors of J. C. Farr & Co. had proved their debts under the assignment. Whether in these circumstances we look for a ratification by Hagerman and Fielder of the transfer of firm property by Farr, as their partner and agent, or for a transfer directly by the joint act of all the partners, or for an estoppel preventing Hagerman and Fielder from denying that the assignment conveyed the effects inventoried and delivered, in any view the property of J. C. Farr & Co. passed to the assignee.

Touching the third proposition, that this property was conveyed subject to the equity of the firm creditors, it would be beyond cavil, had the assignment shown upon its face a conveyance of the property of Farr and also of J. C. Farr & Co. for the benefit of creditors. As was said by Chief-Justice Hornblower in *Scull* v. *Alter, 1 Harr. 147, 150:* "If it is an assignment, not only of the partnership effects and property of the firm, but also an individual and several assignment by the members of their respective and separate estates, then it must be treated as such. The estates and debts must be marshaled, the partnership effects applied, in the first instance, to the partnership debts, and the effects of each member applied, in the first instance, to the, payment of his separate debts." See, also, *Garretson* v. *Brown, 2 Dutch. 425, 435.* But as this assignment speaks of all the

Arnold *v.* Hagerman.

property embraced in it as belonging to Farr alone, a different view might be taken of it. Usually, indeed, courts have held that an assignee for the benefit of creditors is not a purchaser for value, but takes the property subject to all equities that would have been valid against the assignor. *Notes to Basset* v. *Nosworthy, 2 Lead. Cas. Eq. 87.* Many of the decisions to this effect, however, have gone upon the theory that debts proved under the assignment are not extinguished, except so far as they are paid by dividends, or that a pre-existing debt is not a valuable consideration for a conveyance; and as neither of these theories is tenable in New Jersey, there may be found sufficient reasons for holding, in this State, that a creditor, proving under an assignment, should be regarded in equity as favorably as a purchaser for value, although in *Vandoren* v. *Todd, 2 Gr. Ch. 397,* the opposite doctrine prevailed.

But conceding to the assignee and to the individual creditors of Farr who have proved their debts, the rights of purchasers for value, they still are bound by the equity of the firm creditors, for they had notice of that equity. "The rule," says Prof. Pomeroy (*2 Pom. Eq.* § *753*), "is universal and elementary that if a purchaser in any form receives notice of prior adverse rights in and to the same subject-matter, before he has completely acquired or perfected his own interest under the purchase, his position as *bona fide* purchaser is thereby destroyed, even though he may have paid a valuable consideration." That Arnold, before the assignment, and all the personal creditors of Farr, before they proved their claims, were notified that the Asbury Park property had belonged to J. C. Farr & Co., and had been transferred to Farr when that firm and all its members were insolvent, is fully established by the evidence in the cause. This notice before the assignment was acquired by Arnold from conversations with Farr, and by Arnold and many, if not all, of Farr's individual creditors, through inquiries made by Eaton and Lawson, a committee appointed by the creditors to investigate the affairs of Farr and J. C. Farr & Co. After the assignment, but before any debts were proved, such notice was still more definitely communicated to all of Farr's creditors, through the report of their

committee (*Exhibit D 5*), in which the assets and liabilities of Farr, and of J. C. Farr & Co., respectively, are distinctly stated. This report also plainly indicates an understanding or expectation that the property assigned would be marshaled between the creditors of Farr and the creditors of the firm. It was made January 19th, 1884, while the first claim proved was presented to the assignee January 28th, 1884. Fuller notice than this report contained, of the equity of the firm creditors, could not well be given. Hence, those creditors are still entitled to have the partnership property applied to the payment of their debts, in preference to the debts of Farr's individual creditors.

The fourth proposition denies the right of the complainant to impeach this assignment.

The assignment was in the form sanctioned by our statute; it was for the benefit of all creditors who were entitled to any share in the property assigned; it created no preferences, and it provided for no delay beyond what was necessary for the execution of the trust which it properly declared. Although such assignments do hinder creditors from obtaining that priority of lien which otherwise their vigilance might secure, yet they are not on that account within the meaning and scope of the statute, which avoids transfers to defraud creditors. *2 Pom. Eq.* § *994, n.* The assignment was perfected before the entry of complainant's judgments, and, as it operated to divest the legal title of the debtors, the complainant's executions did not become a lien. The assignment, as we construe it, placed all creditors of the same class upon an equal footing, and in such cases equality is equity. Consequently, both in law and in equity, the complainant is bound.

The conclusion of the matter is, that the property of Farr, and the property of J. C. Farr & Co., should be marshaled between the creditors of those two debtors respectively.

It only remains to consider whether the parties and pleadings in the cause are such as will warrant a decree to the foregoing effect.

The parties are Hagerman, Fielder, Farr, all their judgment creditors, and Arnold, the assignee, who represents the other

·creditors in all questions relating to the property assigned. *Pillsbury* v. *Kingon, 6 Stew. Eq. 287.* These include all parties ·necessary for such a decree.

The primary design of the bill of complaint was to have the ·partnership effects subjected to the lien of the complainant's ·executions, and, consequently, it was filed on behalf of the complainant alone; while, in our judgment, the complainant has no ·peculiar lien, and has only a right, in common with all other partnership creditors, to have the partnership assets marshaled ·for their benefit; and, therefore, the bill should have been ex- ·hibited on behalf of the complainant and all other creditors of ·the same class who might come in under it. But the bill sets out all the facts upon which our conclusion is founded, and one ·of its prayers is:

> "That if necessary, a receiver may be appointed to take charge of the busi- ·ness, assets and effects of the said John C. Farr, and also those which were of the said J. C. Farr & Co., and which are claimed by said Arnold, by virtue of ·said pretended deed of assignment, to manage, control and dispose of the same ·under the direction of this honorable court."

This prayer is appropriate for the relief to which we think ·the complainant and the other firm creditors are entitled, and ·the lack of an averment that the suit is prosecuted on behalf of ·all such creditors may be remedied by so framing the decree as ·to secure, for all who come in, a ratable distribution of the part- nership assets among them. *Hendricks* v. *Robinson, 2 Johns. Ch. 283, 297; Wetherbee* v. *Baker, 8 Stew. Eq. 501, 508.*

Let the decree appealed from be reversed, and a decree be en- ·tered in accordance with these views.

MAGIE, J. (*dissenting*).

I agree that the decree below, which set aside the transfer of ·the partnership property, made by Hagerman and Fielder to ·Farr, should be reversed.

The bill attacked that transfer on the ground of deceit and ·misrepresentation by Farr, and a fraudulent conspiracy between ·him and Arnold, his assignee, to hinder and delay partnership

Arnold *v.* Hagerman.

creditors, by converting the partnership assets into Farr's separate property.

I have not been able to find sufficient evidence of the truth, of these charges to sustain the decree.

But if there had been evidence sufficient to induce me to decline to reverse a decree founded thereon, I should still think. the decree indefensible. In my judgment, the bank was not entitled to such relief, because of its laches.

Farr's assignment for the benefit of creditors was made November 30th, 1883. The bank obtained its first judgment against the firm January 3d, 1884. It afterward obtained several other such judgments, the last being entered March 5th, 1884. Its bill was not filed until March 10th, 1884.

After the statutory notice of Farr's assignment was given, his individual creditors exhibited to his assignee claims amounting to over $80,000.

The bank could have filed its bill earlier, at least after January 3d, 1884. Had it acted with reasonable diligence, it would have anticipated the action of Farr's creditors, for the first claim was not filed until January 28th, 1884. Before the bill was filed, claims amounting to over $50,000 were presented, and on that day the remaining claims were filed.

This delay obviously operated to the prejudice of Farr's individual creditors who exhibited claims. By force of our statute, they thereby became debarred of any future action against Farr, except in respect to property fraudulently concealed &c. In determining whether to make claim under the assignment, each creditor was doubtless influenced by the assets inventoried by the assignee. The property in question constituted a large part of the assets so shown. Whoever, therefore, intended to assert an equitable right thereto was bound to be diligent in asserting it, and a delay which would induce innocent persons to subject themselves to the statutory restriction, ought to bar a claim which, if successful, would materially prejudice them.

The learned vice-chancellor concluded that such creditors, by resorting to a court of equity, could have the exhibition of their claims avoided and annulled. I have not been able to discover

any jurisdiction in equity to relieve against a result prescribed by the positive terms of the statute. If such power exists, the fact that such creditors would be compelled to resort to an action for relief would be such prejudice as, in my judgment, to require the delaying claimant to be barred of the relief he seeks.

But while I concur in a reversal, I am unable to agree to the relief which a majority of the court think ought to be accorded to the bank. That relief is, as I understand, to be afforded by a decree marshaling the assets in the hands of Farr's assignee, and applying such as once belonged to the firm to the satisfaction of the firm debts, and the remaining assets to Farr's individual debts.

In the first place, I think this objectionable because such relief is not germane to, but inconsistent with the case made by the bill.

The bill was not filed for the benefit of creditors, but in the sole interest of the bank, and it sought to subject to its judgments and the executions issued thereon, the property which had belonged to the firm and had been transferred by Hagerman and Fielder to Farr. Success upon the pleadings would result in the benefit of the bank alone. The proposed relief would only be germane to a bill in the interest of all the firm creditors, and praying for the marshaling of assets in which they, as creditors, had an interest.

In the next place, I think the individual creditors of Farr, or, if too numerous, some as representatives of all of them, ought to be parties to any proceeding in which such relief is granted. In the case made by the bill, viz., a claim to property in the hands of the assignee, he no doubt so represented Farr's creditors as to justify a decree upon sufficient evidence. But the proposed relief goes upon an equity to admit to a share of the assigned assets other claimants, and to so marshal the assets as to give them a preference. Under such circumstances, I think the creditors necessary parties. *Read* v. *Patterson, 17 Stew. Eq. 211.*

Finally, if these objections were overcome, I think the facts would not justify the proposed decree.

It can only be made upon the theory that Farr's assignment

Arnold *v.* Hagerman.

:to Arnold had a double effect, and transferred to him the former .assets of the partnership for payment of the firm debts, and the ·other assets for the payment of Farr's individual debts. Otherwise Arnold has nothing to do with firm debts.

In *Scull* v. *Alter, 1 Harr. 147,* an assignment for the benefit ·of creditors under our statute was claimed to have such an effect and to be, what Chief-Justice Hornblower called, a *compound* :assignment. It was not determined whether the statute authorized such an assignment which, as was pointed out, would re- .quire an assignee to give separate bonds, and to proceed as if separate assignments had been made. The instrument before the court in that case, however, indicated a clear intent to transfer both partnership and individual property. In the case before us the question of power under the statute to make such a duplex assignment is not raised, because Farr's assignment passes his individual property only, and is incapable of a construction which would pass firm property.

Moreover, when Farr made the assignment, the property in ·question had been converted into his individual and separate property.

No doctrine of the law of partnership is better settled than that a dissolving firm, one of whose members proposes to continue the business, may, by agreement, alter the character of the partnership property, and convert that which was joint into the separate property of him who continues the business. If the agreement is free from fraud, is not executory, and the property is not thereby left subject to liens of the retiring partners for their indemnity, the conversion is effected. If such an agreement is made before an act of bankruptcy, the property will be distributed, not as the joint estate of the firm, but as the separate estate of the continuing partner. And such conversion will not be hindered by the mere existence of debts due by the dissolving firm, for the general creditors have no lien on the property. Judge Story and Mr. (now L. J.) Lindley, both state the doctrine without reserve, and refer to the cases in which it was established. *Story Part.* §§ *358, 359; 1 Lind. Part.* *334; 2 Lind. Part.* *697*. In the notes to the late editions of the latter

book, many cases are collected, none of which indicate any dissent.. It has been held in this court, that when such a conversion was· tainted with fraud, so that the defrauded partners could avoid it in equity, the general creditors could obtain relief but by means· of that equity. *Harrison* v. *Cooley, 7 Stew. Eq. 283.* The same· doctrine was also here applied to the cognate case of the conversion of individual into partnership property. *Clements* v. *Jessup,. 9 Stew. Eq. 569.* The doctrine, with the reasons therefor, is well set forth in the following cases in the United States supreme· court: *Case* v. *Beauregard, 99 U. S. 119 ; Fitzpatrick* v. *Flannagan, 106 U. S. 648; Huiskamp* v. *Moline Wagon Co., 121 U. S. 310.*

Now, the transfer from Hagerman and Fielder to Farr was· completely executed. The retiring partners retained no lien on the property transferred for their indemnity ; on the contrary, the transfer was absolute and unconditional, and the agreement of dissolution shows that they relied for indemnity solely on Farr's personal covenant. When, therefore, the transfer is held not to be fraudulent, it results that the firm property became then converted into the individual property of Farr, and the· firm's general creditors cannot follow it.

I shall therefore vote, not only to reverse the decree below, but for a decree dismissing the bill.

Mr. Justice Depue concurred with Mr. Justice Magie.

*Decree unanimously reversed.*