CRUIKSHANK v. WALSH et al.

(Supreme Court, Appellate Division, Second Department. March 21, 1899.)

FRAUDULENT CONVEYANCES—EVIDENCE.

In an action for an accounting, defendant attempted to defeat recovery by falsifying his accounts; and between the filing of the report of the referee, directing a judgment against him, and its entry, he made various conveyances of property, and then executed an assignment for the benefit of creditors. Prior thereto, defendant had been the owner of a half interest in a prosperous business, which had suffered no losses, except a small one through an accommodation indorsement. Part of the property was transferred as security for an ostensible loan of $33,000, procured within two years preceding the assignment, but the assignor could not account for $22,000 of the proceeds of the alleged loan, except that he had lost it in gambling, and part in an investment, of which there was no evidence, except his own statement. An equity in a boat was fraudulently transferred by him to another, and there was evidence that

he attempted to conceal other items of property. Other property was transferred to his brother, ostensibly in payment of an overdraft on the assignor's interest in the firm; but the value of the property transferred as security for the overdraft exceeded the actual indebtedness, which the assignor claimed to be $20,000, but which in fact was only $9,000. The only property transferred by the assignment for the benefit of creditors was an incumbered house, and for four years thereafter the assignee permitted the assignor to reside therein, on payment of a stipulated rent, which was insufficient to pay the interest on the incumbrance and taxes. The assignee testified that he did not know whether the property was insured, or whether the taxes were paid, and that he gave the assignor credit for a certain sum as rent, on the assignor's statement that he had paid it on interest on the mortgage. The assignee never made any effort to ascertain whether the assignor had any other property than appeared in the schedule, and left the management of the whole matter to his attorney, who was also the attorney for the assignor. The transfers made just prior to the assignment included the assignor's entire interest in two corporations, of which he was the active manager, and he continued in control thereof after the transfer. *Held*, that the assignment was fraudulent as against creditors.

Appeal from special term, Kings county.

Action by Robert A. Cruikshank against William H. Walsh and another. There was a judgment for defendants, and plaintiff appeals. Reversed.

Argued before CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

R. Burnham Moffat, for appellant.

J. Stewart Ross, for respondents.

HATCH, J. The recklessness in commercial dealing which characterizes this cause makes it, in many of its aspects, the most extraordinary case to which our attention has been called. The action is brought by the plaintiff to set aside an assignment as having been made for the purpose of hindering and delaying creditors, and that the same is therefore fraudulent and void. The assignor is James McCaldin, who, together with his brothers, William and Joseph, had constituted the firm of McCaldin Bros. It is needful, in order that we may obtain a fair view of the case, to examine somewhat the history of this firm. The business was started in a very small way by William J. McCaldin in 1865. In September of that year, James McCaldin joined his brother from Ireland, and worked for him until 1867, when a partnership was formed. The business was selling coal and wood, and the substantial capital of the firm consisted in the energy and business capacity of the two brothers. The business continued to grow to considerable proportions. Joseph McCaldin, the other brother, then about 20 years of age, came to this country in 1876, and worked for the firm until 1878, when he became a member. He put no cash into the firm, except such of his earnings as he had not drawn; but he was given a credit at the time of his entry into the firm of $6,000, and a one-quarter interest in the firm business. William McCaldin withdrew from the firm in 1887 on account of ill health, and the business was thereafter conducted by James and Joseph as equal partners. During this period of time the firm had extended its coal and wood business; was the owner of a lumber yard,

several lighters, steamships, and tugboats; and carried on successfully these different branches; it also had a one-half interest in the Morse Iron Works,—all of which appeared to be prosperous and earning money, except the Morse Iron Works. While the value of the firm property over and above its liabilities is not given, yet it is quite clear that a large surplus existed. It is stated generally that in 1894 and 1895 the firm suffered some heavy losses on account of the conduct of James McCaldin in speculations, gambling, and the indorsement of accommodation paper; but a careful examination of the record, in our opinion, leads to the conclusion that no losses whatever were sustained by the firm, except a possible small loss by reason of James' indorsements of the Abeel note, to which attention will be hereafter called. The claim is that a large loss was suffered by reason of the investment in the Morse Iron Works; but it appears in the record that while the iron works was financially embarrassed, and was placed in the hands of a receiver, yet it paid at least 65 cents on the dollar. When its property was sold, it was purchased by an agent of the McCaldins, and the firm thereafter organized a stock company called the Ross Iron Works, dividing the bulk of the stock between the members of the firm, and in the conduct of the business within a year thereafter declared and paid a dividend of 20 per cent. It is therefore evident that so far as the investment of the firm in the Morse Iron Works was concerned, if it be admitted that a loss was sustained under the management of Morse, it was immediately recovered upon the sale and reorganization. Hence it is apparent that, so far as the firm of McCaldin Bros. is concerned, it was prosperous in every branch of its business, suffered no losses, and, at the time when James McCaldin took title in trust to the steamboat Caroline Miller, its prosperity had suffered no diminution, and its earnings thereafter were larger than at any prior time in its history. Although James McCaldin up to June, 1894, owned a half interest in all the business of the firm, and had no outstanding liabilities which were tangible, except as the same are made to appear by his oral testimony, to be hereafter noticed, yet in that year it suddenly developed that, without any losses, James had become largely indebted to his brother Joseph and to other persons, his property was swept away, he became suddenly insolvent, and in February, 1895, was forced to make an assignment for the benefit of creditors.

The history of what has transpired since the assignment is quite as remarkable as the sudden insolvency. The inventory of assets shows that the assignor at the date of his assignment was possessed of premises at 164 South Oxford street, subject to a mortgage thereon for $8,000 and accrued interest, and about $400 in taxes for the year 1894. The other property consisted of 20 shares of stock of the McCaldin Bros. Company, pledged to Henry C. Piercy to secure a note of $1,250, and 5 shares of stock of the Ross Iron Works, pledged to Matthew Jackson, of Brooklyn, as security for a note of $9,000. The only tangible asset, therefore, which passed by the assignment, was the house and lot. The value thereof is stated to be $16,000. It was testified by Mr. Moffat that in 1896 he called upon the assignee, and asked what rent he was getting for this house, and that Walsh in-

formed him that he was in receipt of no rent for it.    It is conceded that the premises continued to be occupied by McCaldin as he had occupied them prior thereto, and that no change whatever had apparently taken place in respect of any property which he had at the time of making the assignment.    Walsh, the assignee, was sworn as a witness; and, while he did not in direct terms dispute the testimony of Moffat that he stated he had received no rent, he did testify that the premises had been rented to the assignor for $600 a year; his testimony in this respect being that he met McCaldin upon the street by chance, told him he must have some rent, that they agreed upon $600 a year, and that thereafter McCaldin paid in all $700, $50 of which he had paid to the surety company for his bond as assignee, $250 of which he had paid to his attorney, and $200 of which he had credited to McCaldin as payment of interest upon the mortgage.    As to this last payment, McCaldin produced no receipt from the mortgagee; the assignee gave McCaldin no credit for it, except in his head, and made no personal examination to find out whether it was paid to the mortgagee or not.    The assignee further testified that he did not know whether the property was insured, or whether the taxes were paid, or whether the interest upon the mortgage was paid, except that as to the latter he accepted the statement of McCaldin, and credited him with $200.    The assignee further testified that he had taken no steps whatever to discover whether the assignor had any other property than appeared in the schedules, or whether he had any equitable interests of any character which might be reached, and that he had given the subject-matter of the assignment no attention whatever, but had left the whole matter to his attorney, relying upon him to do all that was necessary in connection with the assigned estate. Although he swore that McCaldin was indebted to him in the sum of $1,700, such indebtedness does not appear in the schedules.    In this connection it appears that the attorney of the assignee was also the attorney of the assignor, and had been prior to his assignment, and to some extent had represented the firm of McCaldin Bros.    Such relation, however, can in no sense impugn the good faith of the attorney, or his integrity in the matter, and nothing which appears in the record in any wise reflects upon him.    But while the prior relation of attorney to the assignor does not disqualify him from acting as attorney for the assignee, which frequently occurs, yet it is quite clear that the assignee fails in the discharge of his duty to the trust estate and the creditors whom he represents when he assumes to devolve all of the duties which the law devolves upon him, by reason of his acceptance of the trust, upon his attorney.    Especially is this true where the attorney has also represented the assignor.    No one can read the testimony of the assignee appearing in this record without reaching the conclusion that he has done absolutely nothing in discharge of the duties of his trust.    It is quite true that this litigation, resulting in the filing of a lis pendens, has had the effect to tie up the real property, and probably prevent a profitable disposition of the same; yet such fact does not excuse the assignee from seeing that the property is otherwise properly protected, and that the fixed charges resting upon it are discharged, or some steps taken in connection with

it whereby the creditors of the estate may realize therefrom its value in the discharge of their debts. As a matter of fact, the present assignment, whether intentionally or otherwise, has operated to tie up the property of the assignor, and has left him in the beneficial enjoyment of the same; and the only sum which he has been or is required to pay is $600 a year for the use of the property,—a sum insufficient to pay interest, taxes, and insurance upon the same. So that not only has he not been inconvenienced by his assignment, but he has received a direct benefit, in being able to use and enjoy the property which he possessed, at a less cost to himself than though he had made no assignment, and paid the fixed charges as they accumulated upon the property. Therefore the present status of the assignor and of his creditors is one of actual benefit to the former and deprivation to the latter. Over four years have now elapsed since this assignment was made, and, so far as the creditors are concerned, no one has received a dollar or benefited by the assignment, except the surety company which furnished the bond, the attorney who conducts the proceedings, the assignee who represents the creditors, and the assignor.

The plaintiff is a judgment creditor of James McCaldin. His recovery of the judgment arose from the following facts: The British steamship Dawn was wrecked on the Bahamas, and was purchased by one Miller and brought to Baltimore. On November 7, 1885, Miller sold to the firm of Walker, Donald & Co., of Glasgow and New York, a one-third interest in the vessel for $12,000; Miller agreeing to pay all expenses and bills necessary to fit the vessel for sea. The vessel was given an American register, under the name of the Caroline Miller, and the purchase price was paid by Walker, Donald & Co. The assignment of the third interest was not recorded, and Miller, after the repairs had been completed, and when there were many bills outstanding, borrowed for his personal use the sum of $10,000 of J. Hart & Co., of Baltimore, and gave to that firm a mortgage on the vessel. Of the bills left unpaid by Miller, one was to the Columbia Iron & Dry-Dock Company of Baltimore for $19,250; and that company, learning of the mortgage, libeled the vessel as she was about to sail, and forced Miller to give a bond for value. His bondsmen, Stockbridge and Brown, of Baltimore, to protect themselves took a second mortgage on the vessel; the same being executed March 19, 1886. Walker, Donald & Co. were not informed of these mortgages; and Donald, the New York member of the firm, upon discovery, demanded, and on July 13, 1886, obtained, from Miller a transfer of the record title to an undivided one-third interest in the vessel, subject to the two mortgages, to James Parker, of New York. The day prior to this transfer, Miller transferred to his bondsman Brown the record title to the other two-thirds, and Brown had control of the vessel. Under these circumstances, James McCaldin agreed to take title to the vessel, advance the moneys necessary to clear her of all liens, and repay himself and his compensation out of the proceeds of the sale of the vessel to a third party. It was then expected that this sale would shortly be made. However, the negotiation fell through, and McCaldin was left with the vessel upon his hands; having paid

the outstanding mortgages, subject to the interest held by Parker, and the bills which were legal charges against the vessel. McCaldin thereupon started in to run the vessel, and made a profitable charter of her to other parties. He continued so to run the vessel, receiving all her earnings, up to April, 1887, when he claimed to have sold her to William H. Walsh, his assignee, for $52,250, and immediately took back from Walsh a power of attorney, under which he has since that time managed the vessel. Although evidence was given tending to establish that McCaldin did not make a bona fide sale of the vessel to Walsh, but only transferred the title in order to cut off certain claims against her, yet for all the purposes of this lawsuit, such transfer is to be regarded as a sale. During the period when McCaldin held the vessel as trustee for himself and Walker, Donald & Co., to whose rights the plaintiff in this action succeeded by assignment, he rendered no account either of expenses or earnings to his cestuis que trustent; and after the sale they called upon him for an accounting and delivery to them of their proportionate part of the proceeds of the sale and earnings, and, being refused, brought an action against James McCaldin and Miller for an accounting, and recovery of such sum as should be found their due. Both defendants answered through the same attorney, and claimed that, after deducting charges against the vessel and commissions to McCaldin, there remained a balance due to him of $6,182.74. That action was commenced in August, 1888; was referred to a referee for trial and determination May 9, 1890; was determined by the referee December 24, 1894, and final judgment entered February 25, 1895. The record of that lawsuit was introduced in evidence upon the present trial, and forms a part of the record in this case. It appears from the evidence introduced upon that trial, either by undisputed proof or by unimpeached testimony, that James McCaldin, in order to make up a bill for expenses incurred in running the vessel, which should wipe out the interest of the plaintiff therein, deliberately raised some bills which he had paid, falsified others, created fictitious charges, caused to be taken from his account in the books, embracing the account of the Caroline Miller, the original entries, procured fresh leaves to be bound in the book, and entered therein a fictitious account, in order to sustain the raised and fictitious bills which he produced to wipe out the claim of the plaintiff therein. These raised and fictitious bills were produced upon the trial, and McCaldin testified upon the stand that he had either paid them in person, or had furnished the money by which they were paid, or had subsequently discharged the same through other parties; his claim upon the trial being that for all of these bills, of every character, he had, in some form or other, parted with their equivalent in value, and was therefore entitled to charge them against the plaintiff in the action. In order that there may be no doubt upon this subject, we review some of these bills. Among those introduced was one for $118.90, which McCaldin swore he paid to the Magnesia Covering Company. The president and bookkeeper of this company were subsequently called as witnesses, and they testified that the bill, as presented, and as paid to the company, was for only $18.90. McCaldin swore that he paid the steamtug Atlantic $311 for towing the

Caroline Miller at Newcastle, Pa. The plaintiff produced the owners of the tug, and McGrody, the captain. They testified,—the first, that there was no entry in the books of any such amount; and the second, that he had never had a bill as large as that for the services of the tug. In addition to this, it was shown by the testimony of Thomas Marple, a United States deputy marshal in Philadelphia, that at the time when the bill for towing was charged the steamer was in his custody, under a libel, and tied at the dock in Philadelphia. It was subsequently ascertained that on another date the Atlantic had towed the steamship, and charged therefor $11, and that this bill was raised $300. Another bill which McCaldin swore he paid was one to William Wall's Sons for $202.80 for two new hawsers for the Caroline Miller. This bill was receipted in McCaldin's handwriting, and he swore that he paid the bill to William Wall & Sons, and so receipted it. He got the name of the firm wrong in his receipt. It was proved upon the trial by the manager of this firm, and by their books, which were produced under subpœna, that Mr. Whitlock, who was the order clerk and salesman of the firm, and who recognized the bill as being in his own handwriting, had been applied to by some person from McCaldin for an estimate of rope for the Caroline Miller. He wrote upon a billhead the hawsers and their value, but in fact no order for rope was ever given, and the matter was never heard of again until the time of the trial. McCaldin swore that in April, 1887, he paid to William J. Smith, for painting the bottom of the Caroline Miller while she was in dry dock, $193. This bill was produced, it appeared to be receipted, and McCaldin swore that he paid William J. Smith the amount of the bill under a contract that he made. Subsequently he swore that the contract was made by Capt. O'Brien, but he still swore that he paid it. The plaintiff called to the stand William J. Smith, whose place of business was at No. 9 Stone street. Smith recognized the billhead as his, but swore that he performed no service, had received no payment, and had never heard of the Caroline Miller. He further testified that the signature to the receipted bill was not his, nor any handwriting which he knew, and was not authorized by him. The plaintiff further called to the stand William R. Lord, Jr., a boy 17 years of age, who in 1887 was in the employ of McCaldin Bros. He was shown this bill, testified that it was in his handwriting; that he wrote it at about its date at the request of James McCaldin, who placed before him the blank billhead, and a copy of what he was to write upon it. Another bill for carpenter work, purporting to be made by John Steele & Co. for $220.93, was sworn to by McCaldin as having been paid by him under date of May 15, 1887. It was proved by the bookkeeper of McCaldin Bros (one Selfridge) that he procured these bills to be printed at the instance of McCaldin, that Steele was their foreman carpenter, that there never had been such a firm as John Steele & Co., and that the address given on the billhead was the spot occupied by the lumber yard of McCaldin Bros., at the corner of Sullivan and Wolcott streets, in Brooklyn. McCaldin was asked the whereabouts of this firm, and stated that he did not know, and then, upon reference to the bill, stated: "It says 'Wolcott street,' here." The receipting part of this bill was

testified by Selfridge to be in James McCaldin's handwriting. The rebinding of the book was testified to by the binder who did the work of binding, who states that he demurred to doing it at first, but that at the solicitation of McCaldin's bookkeeper he finally consented to, and did, remove from the book pages that had writing upon them,—he not knowing the account,—and bound in place thereof blank leaves. It also appeared that the leaves bound in the book did not correspond with the edges of the original leaves, and Selfridge testified that James McCaldin directed him to mark the whole of the edges with red ink. Thereafter, according to the testimony of Selfridge, the cooked-up account of the Caroline Miller was entered therein. This, however, was not used upon the trial, but another and an older book, containing the account of the American Ballast Log Company, which had blank leaves in it, was used for the purpose of evidencing the account. Under this process McCaldin succeeded, upon the trial, in creating an apparent indebtedness in his favor in the sum of something over $6,000. But, of the facts by which said sum was produced, the above is but a partial statement of the steps to which he resorted.

In 1894 the firm of McCaldin Bros. transferred all of its property to a corporation known as the McCaldin Bros. Company, stock in which was issued to the members of the firm in equal portions. Intermediate the time of the determination of the referee and the entry of the judgment, negotiations were had for a settlement of the sum which had been recovered by the plaintiff in his action. While these negotiations were pending, and in June, 1894, James McCaldin made the transfer of his property as hereinbefore stated, and thereafter made his assignment. It is his present claim that these transfers prior to his assignment were made in discharge of bona fide debts which he owed; that he confidently expected to succeed in his resistance of the plaintiff's demand, and was advised by his counsel that he might expect a favorable decision from the referee. It is quite evident that McCaldin could not reasonably have hoped for such a result. His barefaced attempt to defraud had been exposed by unimpeachable testimony, and his own credibility as a witness in connection therewith was hopelessly wrecked. He knew, as the referee found, that upon an honest account he was indebted to the plaintiff in a sum equaling the judgment; and, in view of such knowledge upon his part, it is preposterous to claim that he could have had any reasonable expectation, in view of his exposure, that he could by any possibility obtain a favorable judgment in the action. His counsel was sworn, and testified that he expected a small recovery might be had. But even the credulity of counsel cannot be held to avail, as against the actual knowledge of James McCaldin that he had resorted to fictitious charges in order to defeat plaintiff's recovery. No sane person, having experience in weighing testimony, after reading the record of that trial, can escape the conclusion that James McCaldin had every reason to expect that a judgment to a considerable amount would be rendered against him. Nor can any reasonable mind view this testimony, and that which will be hereafter noted, and reach any other conclusion than that the transfers made in June, 1894, and

the assignment which followed, coupled with the negotiation for a settlement, were made with the purpose and object of hindering and delaying the collection of the judgment which the plaintiff recovered. In addition to what we have already stated, it appeared that James McCaldin had been examined as a witness in supplemental proceedings prior to the commencement of this action, and also upon this trial. His testimony is filled with contradictions and improbable stories; and, measuring it as a whole, with the conceded facts in the case, it is clear that his credibility has been so far shattered that no reliance can be placed thereon, in consequence of which his statements must be disregarded, except when appearing against his interest, or except the same are corroborated by other testimony.

We have deemed this recital necessary in order that we may now examine the particular fraudulent acts which it is claimed vitiate this assignment. It is not at all necessary that we call attention to the evidence in detail, or to all of the fraudulent acts with which, in our view, this record bristles.

It was claimed upon the trial that James McCaldin was indebted to Joseph in about the sum of $20,000. Of this amount, Joseph testified to transactions from which it is claimed an indebtedness is established of $14,734.83. The remainder of $5,000 or $6,000 required to swell the indebtedness to $20,000 is not specified, and rests in general statements of James and Joseph. The plaintiff claims that an analysis of the testimony shows that the indebtedness could not, in any view, exceed $9,634.38, while the conceded transfers by James to Joseph of property in June, 1894, were $11,708.04, and that other transfers not conceded increased this sum to about $14,000, and correspondingly decreased the indebtedness. We do not propose to analyze the testimony nor these figures. We conclude from the testimony that the indebtedness to Joseph is in part, at least, fictitious, and that James McCaldin has a substantial interest in some of the property so transferred. In support of this view, a statement of one item will suffice. The overdraft of James was claimed to be $14,939.75. In order to make the accounts of the brothers balance, it would require the payment into the firm of one-half of this sum. It appears that there stood upon the books of the firm to the credit of the assignor's wife, Mary McCaldin, 167 shares of the capital stock of the American Shipping & Transportation Company, which McCaldin placed in her name, without consideration, on January 7, 1892. No account was opened with Mrs. McCaldin on the books of the firm, but dividends upon this stock were paid into the firm, and went into its general bank account. In James McCaldin's personal account appear a large number of checks payable to Mrs. McCaldin; and this included the dividends upon the stock, as well as a certain sum of money which McCaldin allowed to his wife for household expenses. But it is evident that the dividends paid upon this stock belonged to Mrs. McCaldin, and did not constitute an indebtedness of James McCaldin. The firm had the money, and payments of these dividends could not be rightfully charged to James McCaldin when they belonged to his wife. So that, to the amount of these dividends, James McCaldin was not indebted to the firm, nor ought they to have been

charged in his personal account; and, to the extent that dividends were received, they should have been deducted. Assuming that Mrs. McCaldin owned the stock, this would have produced a corresponding deduction of the amount of the indebtedness owed by James to Joseph. We assume in this statement that Mrs. McCaldin owned this stock. In fact, she never had it, and so far as the record shows, never made claim to it. James bought it with his funds, always controlled it, and collected its dividends. A bookkeeping entry changes its title. It is clear that Mrs. McCaldin could not own it, and James be charged with the payment of its dividends, as between him and the firm which received them; and, if Mrs. McCaldin did not own it, then the 167 shares belonged to the creditors of James.

We pass to the consideration of another matter. James McCaldin claimed to have borrowed from William H. Walsh and Matthew Jackson, during the two years preceding his assignment, $33,000 in cash, to secure which he subsequently transferred to Walsh 160 shares of the stock of the McCaldin Bros. Company, and secured Jackson with 5 shares of the stock of the Ross Iron Works, and otherwise reduced his debt to him to $9,000. As to this sum of money James McCaldin could give no account, except that he paid to a Mr. Pearcy $475; that he lost in a poker game on a steamer, coming from Europe (when and to whom he was not able to state), $2,400; that he invested in the Wales Cement Company $4,000, which he lost, and in a mill at Wilson, Va., $4,000 more,—making a total of $10,875, which still left him of this money the sum of $22,125. If we assume that James McCaldin is truthful in his statement of losses above specified, yet the $22,125 remains unaccounted for. He paid no debts with it, did not invest it in the firm business, nor in that of either corporation, or elsewhere; and, for aught that appears in this record, he had that sum in cash on hand at the time when he made his assignment, unless we give force to his vague, general statement that he lost it in games of poker, which he does not specify, and to whom he does not know. We have already observed that James McCaldin ought not to be believed, unless corroborated. The loss of $2,400 at a game of poker would ordinarily impress itself on the mind of the loser to such an extent that he would be able to state the voyage upon which he lost it, and the name of the person to whom he lost it. The loss to the Wales Cement Company was not attested by a single scrap of paper or stock, or in any other manner, save as the statement fell from the lips of James McCalden. And, if his statement be true, he is still indebted to the Wales Cement Company, although no such indebtedness is stated in his schedule of debts. So far as his investment in a mill in Virginia is concerned, it appears from his own testimony, tested by the dates which he gives, and by the books, that the firm had been interested therein before he claimed to have gone into it as an outside transaction. Other specific acts where property has been concealed, we think, are found in the item of $1,400 due James for salary as manager of the Ross Iron Works, the certificate of membership in the Produce Exchange, standing upon the books of the firm in the name of James, and an equity of about $6,000 in the tugboat James McCaldin, claimed to have been sold to Sullivan. We by no means say

that there are not more items concealed which may be extracted from this voluminous record. We do not, however, state the evidence showing wherein the specified items, or others not specified, have been fraudulently concealed, as the limits of an opinion have been already passed, and enough has been said to characterize this assignment.

It is claimed that Joseph forced the settlement in June, 1894, for the reason that James McCaldin had overdrawn his account, and indorsed accommodation paper. So far as the overdraft of the firm account is concerned, assuming it existed, it was very much smaller than the amount claimed, and, in the large business which was carried on, can of itself scarcely be considered an unusual circumstance. So far as the accommodation indorsement of paper is concerned, it appears that James McCaldin indorsed two notes,—one to Abeel & Co., for $3,500, for the accommodation of Morse, then interested in the Morse Iron Works. It is not entirely clear how much of this note Joseph was required to pay. It did not in any event exceed one-half, and, in one view of the evidence, about one-half of the latter sum. But, however this may be, we think it is clearly an insufficient circumstance, in view of all the others which appear, to account for the sudden divestiture by James of all his property. As we have already observed, the business at this time is prosperous. The reorganization of the Morse Iron Works was successful, and resulted in a large measure of prosperity. The stock of the McCaldin Bros. Company was worth at least par; and, although James was devested of all his property, he was nevertheless continued in the active management of both concerns, and, so far as appears, has from that day to this exercised control and management in and about the business prosecuted by the two corporations. Indeed, the vessels which have been transferred have at all times been under his management and control; and it passes belief that all of those conditions can exist, and James have no substantial interest therein. It is quite true that fraud might not be predicated upon any single transfer of property, or transaction, standing alone, and, disconnected from other circumstances, all combined might not show it. But, when the whole is gathered together, the inference is such as to shock the conscience of the ordinary man, and lead irresistibly to the conclusion that the transfers of property in June, 1894, and the execution of the assignment in February following, were part and parcel of a scheme to hinder, delay, and defraud the creditors of James McCaldin. The observations made by Chancellor Kent in Hendricks v. Robinson, 2 Johns. Ch. 283, 299, may be quite appropriately applied to the facts in this case; and within the definition laid down by Mr. Bigelow (2 Bigelow, Fraud, 17, 18) this case seems to easily fall.

We are forced to the belief, in which there rests no shadow of doubt, that this assignment is fraudulent, and that the judgment which sustains it is against the clear weight of evidence, in consequence of which we reach the conclusion that the judgment should be reversed, with costs to the appellant to abide the final award of costs. All concur.